[S. F. No. 6092. In Bank.—June 14, 1913.]

## In the Matter of the Estate of MARIA CONCEPCION DE LAVEAGA, Deceased.

WILL—CONTEST—EVIDENCE—INCOMPETENCY OF TESTATRIX—UNDUE INFLUENCE.—On this contest of the probate of a will, the evidence properly admitted is held amply sufficient to sustain the findings of the court both that the testatrix did not have the sound and disposing mind and memory essential to the making of a last will, and that the document offered for probate was the result of undue influence.

ID.—NATURE OF MENTAL INCOMPETENCY.—One may be mentally incompetent to make a last will by reason of a want of development of the mental faculties, although he is neither a lunatic nor an idiot, nor in any way possessed by delusions.

ID.—REQUISITES TO SOUND AND DISPOSING MIND.—It is essential to the sound and disposing mind requisite for the making of a will that the testator have an understanding of the nature of the business in which he is engaged, and an understanding and recollection as to his property which he means to dispose of, of his relations to his relatives and those around him, of the persons who are the objects of his bounty, and the manner in which it is to be distributed.

ID.—ARRESTED MENTAL DEVELOPMENT AMOUNTING TO INCOMPETENCY.— The evidence properly admitted is held to sustain the theory of the contestant that, while the testatrix was neither a lunatic, an idiot or an imbecile, nor in any way a victim of insane delusions, her mind was arrested in development during childhood and never materially progressed, with the result that in so far as her mind was concerned she was practically a child to the day of her death, and was never mentally competent to dispose of her large estate by will.

ID.—EVIDENCE OF UNDUE INFLUENCE.—The evidence is also held amply sufficient to sustain the finding of undue influence operating directly upon the testamentary act, notwithstanding the testimony to the contrary of the only persons who were present at the time of the execution of the alleged will.

ID.—EVIDENCE OF INCOMPETENCE—BUSINESS OF TESTATRIX TRANSACTED BY OTHERS.—On the trial of such contest, letters written by the proponent of the will, at times when she had personal charge of the deceased, to the manager of the latter's property, acknowledging receipt of monthly drafts for the deceased and advising him how much she would need per month for the future, were admissible in evidence on behalf of the contestant as tending to show the actual transaction of the business of the deceased by the writer, a matter going to the acts and conduct of the deceased herself.

ID.—MANNER OF TREATMENT BY FAMILY—CONDUCT OF TESTATRIX.— While the manner in which a person whose sanity is in question was treated by his family is not, taken alone, competent substantive evidence tending to prove insanity, because it is a mere extra-judicial expression of opinion on the part of the family, still it is proper evidence when given in connection with the conduct of the alleged insane person under treatment, as illustrating and explaining such conduct.

ID.—ACQUIESCENCE OF TESTATRIX IN COURSE OF CONDUCT.—Absolute acquiescence by the person whose soundness of mind is in question in a course of conduct on the part of those around him with relation to his property and personal affairs, which no person of sound

mind would tolerate or acquiesce in, is competent evidence tending to show an unsound mind.

ID.—LETTERS AS PART OF RES GESTAE OF TRANSACTION OF BUSINESS.—Where the business of such person is transacted by others by means of letters and cablegrams from one to the other, such letters and cablegrams constitute a part of the *res gestae* in the matter of the actual transaction of business.

ID.—DECLARATIONS OF LEGATEES AND DEVISEES UPON QUESTION OF MENTAL COMPETENCY.—The declarations of any number of legatees or devisees less than all upon the question of the mental competency of a testatrix is not admissible in evidence on the issue of competency. This rule is applicable to the declarations of a person who is executrix, proponent and principal beneficiary of the will. The same rule applies where the evidence is addressed to the question of undue influence.

ID.—ADMISSION OF DECLARATIONS FOR LIMITED PURPOSE—APPEAL.—Where the trial judge, upon the hearing of the contest, consistently ruled out such declarations when offered as independent substantive evidence on the issues of incompetency and undue influence, and subsequently found against the validity of the will because of mental incompetence of the testatrix and undue influence, it will be assumed on appeal, that such declarations, when admitted in evidence for particular purposes, were not considered by the trial judge for any other purpose than the ones for which they were admitted.

ID.—PAPER USED TO REFRESH MEMORY NOT TESTIMONY.—A paper used solely for the purpose of refreshing the memory of a witness is in no sense testimony, and admissible in evidence as such by the party producing the witness, except in so far as it is testified to by the witness to be true, and thus made a part of his evidence.

ID.—SURPRISE—IMPEACHING WITNESS—FAILURE TO TESTIFY—COLLATERAL MATTERS.—A party has no right, on the ground of surprise, to impeach his own witness by showing previous inconsistent statements made by him as to matters concerning which he has failed to testify, as for instance upon matters as to which he has said that he did not remember, or as to matters concerning which he has given testimony that are purely collateral or irrelevant. The test whether the matter is collateral is, could the fact as to which the inconsistency is predicated, have been shown by evidence by other witnesses, independently of the inconsistency.

ID.—IMPEACHING WITNESS BY CONTRADICTORY LETTERS.—Where the contestant of the will offers the proponent as a witness in his behalf, and the witness gives testimony against the contestant as to a matter clearly material and competent upon the issue of competency, letters previously written by the witness to the contestant containing

statements inconsistent with her testimony on the trial upon such subject, are admissible for the purpose of impeaching the witness.

ID.—ATTEMPT TO IMPEACH AS TO COLLATERAL MATTERS—OBJECTION MUST BE SPECIFIC.—Where letters offered for the purpose of impeaching such witness are inadmissible solely because the matters as to which the impeachment was attempted were collateral, objections to their introduction should have been based on that specific ground. A general objection, on the ground that as declarations of the witness the letters were incompetent against the other beneficiaries in the will, is not sufficiently specific.

ID.—IMMATERIAL ERROR IN ADMITTING INCOMPETENT EVIDENCE.—It is held, that the erroneous admission of such letters, although they contained statements tending to show that the witness had expressed herself at various times substantially as entertaining the opinion that the testatrix was mentally incompetent, was without prejudice, as they in no substantial degree added to the showing to' the same effect that was made by such portions of her testimony as either were given without objection or properly admitted over objection.

ID.—OBJECTION TO EVIDENCE FIRST MADE ON MOTION TO STRIKE OUT.— Where such witness, who was a sister of the testatrix, had testified in response to questions asked by the contestant, that their mother had not made in her will any request of her children for the care and protection of the deceased, and the contestant then offers the mother's will for the purpose of impeachment, an objection to its admission, on the specific ground that the attempted impeachment was upon a collateral matter, although it would have been good if made prior to the admission of the will in evidence, cannot be considered if made for the first time on a motion to strike out the will.

ID.—DISCRETION OF COURT IN STRIKING OUT EVIDENCE.—The trial court is not compelled to strike out evidence received without a sufficiently specific objection, where such objection was practically available to the party before the admission of the evidence, and may refuse to do so in the exercise of a reasonable discretion.

ID.—ACCOUNTS AND LETTERS SHOWING TRANSACTION OF BUSINESS FOR TESTATRIX.—Written settlement of accounts, and letters and other matters relating to a compromise of a litigation, as to each of which the testatrix had a pecuniary interest, and in which she was represented by members of her immediate family who assumed to act in her behalf, without consultation with her, were properly received in evidence on behalf of the contestant, as tending to show the actual transaction at all times, by her relatives, of all the business and personal affairs of the deceased, without consultation with her at any time. Such circumstances, taken in connection with her acquiescence therein, constituted material and competent evidence on the issue of mental competency.

ID.—PART OF LETTER ADMISSIBLE—OBJECTION DIRECTED TO ENTIRE
LETTER.—Where part of a letter offered in evidence is admissible,
the remainder being incompetent, an objection of incompetency
directed to the whole letter is properly overruled.

ID.—RECEPTION OF EVIDENCE ADMITTEDLY INCOMPETENT—APPEAL—
ERROR ASSUMED TO BE WITHOUT PREJUDICE—OPINION.—Where the
trial judge, over the sufficiently specific objection of the proponent
to the admission of a certain part of a letter offered by the con-
testant, erroneously admits the entire letter in evidence, but at the
time of so doing expresses the opinion that the part objected to was
not competent, it will be assumed on appeal that the objectionable
portion of the letter was not considered by him in reaching his
decision in favor of the contestant, and that the error was there-
fore without prejudice to the proponent.  This assumption will be
indulged, notwithstanding the trial judge, in an unofficial opinion
rendered by him in deciding the contest, referred to such objection-
able matter as one of the things tending to show the incompetency
of the deceased.

ID.—LETTER FROM PARENT RECOMMENDING TESTATRIX TO CARE OF
FAMILY—EVIDENCE OF CONVERSATION IN PRESENCE OF TESTATRIX—
REMOTENESS—WEIGHT OF EVIDENCE.—A letter from the father of
the testatrix, in which he recommended her to the care of other mem-
bers of the family "on account of her weak mind," was admissible
in evidence as a part of a conversation had regarding it by the
members of the family, in the presence of the testatrix, during
which the deceased remained silent and unconcerned.  Under the
circumstances of this case, the fact that such conversation took
place some thirty-five years prior to the death of the testatrix, goes
only to the weight to be accorded the evidence, and not to its ad-
missibility.

ID.—CONDUCT OF PERSON AT MEETING WHERE HER COMPETENCY WAS DIS-
CUSSED.—The conduct of a person within a few months of the age of
majority, at a family meeting, where in her presence and hearing her
mental competency is being discussed and the claim asserted and ap-
parently accepted by all present that she is so weak minded as to
need the guardianship and care of others throughout her life, and it
is being discussed whether or not a writing expressing the view that
she is so affected shall be made a public record, is some evidence
on the question of her competency at the time.

ID.—DEPOSITION OF WITNESS—INTIMATE ACQUAINTANCE—IMPEACHING
WITNESS WHO HAS NOT GIVEN HOSTILE TESTIMONY.—Where the
deposition of a witness offered by the contestant disclaimed any
intimacy of acquaintanship with the testatrix, and failed to give
any testimony as expected by the contestant touching her incom-
petency, it was error to admit in evidence, on the ground of sur-
prise, a contradictory letter written by the witness, in which she

expressed the opinion that the testatrix "was completely incapable of taking any determination for herself." Under the circumstances, however, the error is held to have been without prejudice, as it is also so held with respect to the admission of certain correspondence had between the proponent and the contestant and his son, subsequent to the death of the testatrix and prior to the filing of her alleged will.

ID.—STATEMENTS IN DEPOSITION REFERRED TO ON CROSS-EXAMINATION—DEPOSITION NOT RENDERED ADMISSIBLE.—Where a witness for the contestant, upon his cross-examination by the proponent, has his attention directed to certain statements in a deposition claimed to have been previously made by him, and he was asked if he so stated, and answered affirmatively, no part of the deposition being put in evidence by the proponent, the contestant, on redirect examination, is not entitled to offer the entire deposition in evidence, but may show, that in connection with the matters already called to his attention, he had stated other matters, thus giving his whole statement on the subject.

ID.—EVIDENCE TO EXPLAIN IMPEACHING FACT BROUGHT OUT ON CROSS-EXAMINATION.—Where a witness for the contestant, who was a connection by marriage and an intimate acquaintance of the deceased, had testified on direct examination to her long continued mental incompetency, and on cross-examination the impeaching fact had been brought out that during the period of her incompetency he had tendered for approval and had approved by the court an official bond on which the deceased was a surety in a very large amount, the contestant was entitled, on redirect examination, in explanation of the witness's conduct in that particular, to show by him the uniform assumption by all the members of the family that deceased was mentally weak and incapable of managing her affairs; the constant desire on their part to prevent any disclosure of that fact to the public; and the fact that while recognizing her incompetency they nevertheless, for the purpose of protecting her both as to person and property, and preventing a disclosure of her incompetency and a consequent necessity for the appointment of a guardian, adopted and uniformly carried out a policy of having her business transacted in her own name, under their immediate personal supervision and direction, with the understanding that they stood behind and in support of everything that was done.

APPEAL from an order of the Superior Court of the City and County of San Francisco refusing to admit an alleged will to probate. J. V. Coffey, Judge.

The facts are stated in the opinion of the court.

Timothy J. Lyons, P. F. Dunne, and S. M. Shortridge, for Appellants.

E. S. Pillsbury, Oscar Sutro, and Pillsbury, Madison & Sutro, for Respondent.

ANGELLOTTI, J.—The deceased died in Madrid, Spain, on February 4, 1909. At the time of her death she was fifty-two years of age, and was a resident of the city and county of San Francisco. She left an estate valued approximately at from one million five hundred thousand dollars to two million dollars, consisting of real and personal property and located for the most part in San Francisco. She had never been married, and left surviving her as her only heirs at law her sister, Maria Josefa Cebrian, wife of J. C. Cebrian and the proponent of the will here in question, and her brother, Miguel A. de Laveaga, the contestant here.

On June 12, 1909, Mrs. Cebrian filed in the superior court of the city and county of San Francisco, a paper written in the Spanish language, purporting to be the holographic will of deceased. A translation of this paper is as follows:

"In the name of God, Amen.

"I, Maria C. de Laveaga, declare that this is my testament.

"I leave to my brother Miguel or to his children Eighty Thousand Dollars.

"I leave to my sister Pepa Five Thousand Dollars for alms, and One Thousand Dollars for masses, and Fifteen Thousand Dollars for Clemente's children.

"I leave to my nieces Mimi and Pepita Cebrian my wearing apparel, furniture and jewelry.

"I leave all the rest of what I possess to my sister Pepa or to her children, if she does not survive me.

"I nominate executor and executrix my brother Miguel and my sister Pepa, without bonds.

"And I sign it in San Francisco, California, the 15th day of February, 1893.

"MARIA C. DE LAVEAGA."

It is conceded that by "Pepa" was meant Mrs. Cebrian, the same being a name by which she was known and referred to

in the family. With the purported will, Mrs. Cebrian filed her petition for the admission to probate of said paper as the last will of deceased and the issuance to her of letters testamentary, her coexecutor Miguel A. de Laveaga having failed ·to consent to act as executor.

On July 12, 1909, said Miguel filed his grounds of opposition to the probate of this paper, the grounds specified being: 1. That at the time of the execution of the will by deceased, if the same was ever executed by her, she was not of sound mind and was not competent to make a last will; 2. That the execution of the same, if executed at all, was procured by undue influence; and 3. That the execution of the same, if executed at all, was procured by duress and fraud. Answers were filed by Mrs. Cebrian and two of her children, designated in the alleged will as "my nieces Mimi and Pepita Cebrian." The issues thus made were tried by the court, without a jury, the trial commencing on October 28, 1909, and continuing, with some interruptions, to February 20, 1911.

On June 29, 1911, the trial court filed its decision in writing. The findings of fact upon the issues of incompetency and undue influence were that deceased at the time of the writing and signing of said instrument was not of sound mind and was not competent to make said purported will, or any will; and that although said instrument was written and signed by the hand of said decedent, she did not compose said instrument or any part thereof, and did not understand the meaning or the purpose of said instrument, or any part thereof, and that the writing and signing was procured as follows: While said decedent was of unsound mind, and not competent to make a will, decedent was caused by a designing person, or persons, who directed, dictated, and dominated the manual performance of the act, to write and sign said instrument from a form presented by said person or persons, and that decedent in writing and signing the instrument, did not understand, and was, by reason of her unsoundness of mind and mental incompetency, unable to understand and incapable of understanding her mechanical act in writing and signing said instrument, or the meaning or effect of her mechanical act in writing and signing said instrument.

Upon these findings an order was made on June 29, 1911, adjudging that said paper is not the will of deceased and is

not entitled to probate, and refusing to admit it to probate.

We have before us an appeal from such order by Mrs. Cebrian and her two children who appeared in the court below.

The record and briefs presented on this appeal are voluminous. The appellants brought up, under section 953 et seq. of the Code of Civil Procedure, in lieu of a bill of exceptions, a phonographic report of the trial, consisting of twenty-nine volumes containing an aggregate of 16,496 typewritten pages. Appellants' opening "brief" consists of four volumes of printed matter, containing 2,239 pages, and an appendix of 469 pages, and their reply brief contains 700 pages. The respondent has filed a brief consisting of four volumes, with an aggregate of 1,666 printed pages. We mention these facts as to the briefs in no spirit of complaint, for we do not see either that learned counsel for appellants could have properly presented their complaints as to findings and the many rulings of the trial court, with the evidence necessary to explain the same, in much, if any, more compact and concise way, or that learned counsel for respondent could have put their claims in reply to appellants' contention in fewer words.

The claim is earnestly made by appellants that the findings of the learned trial judge are without sufficient support in the evidence, and much of their briefs is devoted to argument in support of this claim, with an analysis of the testimony opposed thereto. Especially is this claim made as to the finding of undue influence. A careful consideration of the evidence has satisfied us that there is no good basis for any such claim, either as to the finding of incompetency or that of undue influence. We shall not attempt in this opinion to do more than to state in a very general way some of the facts relative to the evidence upon which we base this conclusion.

The deceased was born at Mazatlan, Mexico, in December, 1856, and was the youngest of six children. The family moved to San Francisco in 1867, and thenceforth resided there. In 1874 her father died testate, leaving a large estate. In 1882 her mother died. Thenceforth to the year 1888 deceased, who had lived with her mother and her sister Ignacia to the time of her mother's death, her sister Maria Josefa having married Mr. Cebrian in 1875, lived with Ignacia. In 1884 Ignacia and Maria, with four women as companions and servants, went to Europe, where they remained together until Ignacia's death,

which occurred in Rome on February 16, 1888. At that time the Cebrian family were in Paris, and Mr. Cebrian at once went to Rome, and deceased returned with him to Paris, and became a member of the Cebrian household. She continued a member of that household to the time of her death, a period of twenty-one years, being with them at that time on a visit to a married daughter of the Cebrians in Madrid. Shortly after Ignacia's death, the Cebrians, with deceased, returned to San Francisco, where they occupied the Cebrian residence at 1801 Octavia Street. There, on February 15, 1893, according to the testimony of Mr. and Mrs. Cebrian, the alleged will was executed. In 1896 the Cebrian family, with deceased, again went to Europe, remaining there until the winter of 1903, and returning to San Francisco in the spring of 1904. They remained at home until August, 1908, when they went to Madrid.

All of the property owned by deceased was property received by her under the wills of her father and mother, and the rents, issues, and profits thereof. At all times after the death of her mother, her property in California was managed for her by her brother Miguel, the contestant here.

The only direct evidence as to the execution of the will was that given by Mr. and Mrs. Cebrian. Substantially their testimony in regard to this was as follows: On the day of its date, deceased, at the family home on Octavia Street, called them into her room and showed them this paper which she said she had written. She told them that her brother Vicente (Jose Vicente de Laveaga) had told her several times that she should make a will, that it was very easy to do privately, that all she had to do was to write it out and date it with no printing or other matter on the paper, and that when she saw how easy it was she just sat down and wrote it. She then went to her desk and subscribed her name to it in their presence. She then gave it to Mr. Cebrian to read and he commenced reading it aloud, but before he had finished Mrs. Cebrian went into her own room, which adjoined that of deceased. Shortly thereafter Mr. Cebrian and deceased came into Mrs. Cebrian's room, and the will was delivered by deceased to Mrs. Cebrian. Deceased told Mrs. Cebrian to keep it, and Mrs. Cebrian at first put it in a drawer and locked the drawer, and some time later placed it in a trunk where she kept a lot of photographs

and papers. It remained in that trunk continually thenceforth until after the death of deceased and the subsequent return of the Cebrians from Madrid. Nothing was ever said by either of the Cebrians concerning the existence of any such paper until after the death of deceased. Mr. Cebrian testified that at the time he read the will, he asked her first why she left nothing to her brother Vicente, and that she told him that Vicente told her not to, and that he was not leaving anything to any of them. He then asked her substantially why she did not leave more to her brother Miguel, and she said: "Never mind about that; that is my wish, and even if I had twice or ten times what I have, I would not leave him any more. He is just as rich or richer than I am. His children will inherit all his riches. His children have a rich uncle besides, and then, as you know, everything I have in this world is for Pepa. Pepa is the person I love most in the world, and such is my will." The testimony of Mr. and Mrs. Cebrian was to the effect that deceased wrote this will without assistance from any person and without the aid of any form, book or copy. The only persons mentioned in the will as beneficiaries outside of Mrs. Cebrian and two of her children, and her brother Miguel, to whom was given only eighty thousand dollars, were "Clemente's children," Clemente being Clemente de Laveaga, a first cousin of deceased. Deceased never thereafter spoke of the will, so far as the testimony shows, to any person other than Mr. and Mrs. Cebrian, except, according to his testimony, to a son of the Cebrians, Henry de L. Cebrian, on one occasion. He testified that he asked deceased to whom she had given or was going to give a certain picture in her room, if she had given it to his sister Josie, and she said, "I have. I will give it to her when I die," and that she told him that she had left it to her when she died. The alleged will contains no such disposition of the picture. In the same connection, he testified that he had asked her if she had made a will, and she told him "Yes" and that his mother "has it kept for me," and that she must not tell it to anybody.

The theory of contestant was not that the decedent was a lunatic, an idiot or an imbecile, or in any way a victim of insane delusions, but that her mind was arrested in development during childhood and never materially progressed, with the result that in so far as her mind was concerned she was

practically a child to the day of her death, and that she was never mentally competent to dispose of her immense estate by will. It is of course not disputed that one may be mentally incompetent to make a last will by reason of a want of development of the mental faculties, although he is neither a lunatic nor an idiot, or in any way possessed by delusions. As said by the supreme court of Arkansas, in *Pulaski Co. v. Hill,* 97 Ark. 450, 457, [134 S. W. 973, 975] : "The question in all such cases, where incapacity arising from defect of the mind is alleged, is not whether the mind is itself diseased or the person is afflicted with any particular form of insanity, but, rather, whether the powers of the mind have become so affected, by whatever cause, as to render him incapable of transacting business like the one in question. As a general rule it may be stated that, in order to have that measure of capacity required by law to be of sound mind, a person must have capacity enough to comprehend and understand the nature and effect of the business he is doing." It has been substantially declared by this court that it is essential to the sound and disposing mind requisite for the making of a will that the testator have an understanding of the nature of the business in which he is engaged, and an understanding and recollection as to his property which he means to dispose of, of his relations to his relatives and those around him, of the persons who are the objects of his bounty, and the manner in which it is to be distributed. (See *Estate of Huston,* 163 Cal. 166, [124 Pac. 852] ; *Estate of Motz,* 136 Cal. 558, [69 Pac. 852] ; *Estate of Dole,* 147 Cal. 188, [81 Pac. 534].) If for any reason his mind is in such condition that he is not able to fairly and rationally consider the character and extent of his property, the persons who are related to him, or who otherwise may have claims upon him, and the persons to whom and the manner and proportion in which he wishes his property to go, he has not the sound and disposing mind essential to his competency to make a will.

The theory of contestant in this behalf was amply sustained by testimony that was competent and properly admitted as bearing upon the issue of mental incapacity. In saying this we are not to be understood as intimating that incompetent evidence improperly admitted is not to be considered in support of a finding or verdict as against an objection of insuffi-

ciency of evidence.   But excluding from consideration all evidence given on the trial as to which such objection may reasonably be urged, we find ample evidence to support the conclusion of the trial court as to the claim of contestant.   There was a great deal of testimony in support of this claim given by persons who were held to be "intimate acquaintances" within the meaning of subdivision 10 of section 1870 of the Code of Civil Procedure, which authorizes the giving in evidence of "the opinion of an intimate acquaintance respecting the mental sanity of a person, the reason for the opinion being given."   Very many of the "intimate acquaintances" who testified as to their opinion on the ultimate question of mental sanity, were examined in great detail as to their observation of the deceased, her conduct, acts, manner, and mental attainments, the evidence thus elicited not only furnishing the essential accompaniment for their opinion on the ultimate question of mental sanity under subdivision 10 of section 1870, but also constituting original evidence of the acts and conduct of the person whose sanity is in question.   The evidence given on the part of contestant as to the acts, conduct, etc., of the deceased covered the whole period of the life of deceased from the time she first came to California, a child of eleven years of age.   Much of it was given by those who were intimately associated with her in her home life, either in San Francisco or in Europe when she was abroad, and much by those who were most intimately associated with the conduct of her business affairs.   Looking at the great volume of this evidence in the light most favorable to the conclusion of the trial court, as we are bound to do, we find portrayed a woman utterly incompetent at any time to understandingly and intelligently consider her property with a view to its proper disposition by will, and moreover, utterly incompetent alone and unaided to compose and write the admirably constructed document, in so far as phraseology is concerned, which was offered for probate as her last will.   Contestant's evidence tended to show, among other things, that as a girl and young woman she was unable to materially progress in so far as the simplest kind of education was concerned; that her mind remained to the time of her death as that of a child, unable to comprehend anything beyond the most simple matters; that she was always dependent upon those around her in matters concerning which

a normal person acts for himself; that she went where she was told to go and did what she was told to do by the person with whom she lived after her mother's death, first her sister Ignacia, and then the Cebrians; that when in the presence of strangers she suffered her relatives to reply to remarks addressed to her; that her powers of conversation were limited to the most simple things of every-day life, much as a young child's powers of conversation are limited; that during the whole time she was with Ignacia, 1882 to 1888, she was really, so far as her own conduct implied "in charge" of Ignacia, who handled the money sent from San Francisco for her maintenance, acknowledged its receipt, selected the places where they should stay, made all the arrangements and paid all the bills, chose her clothes and amusements, and, in short, uniformly treated her as a young child; that during all this time she neither personally acknowledged receipt of a single one of the monthly drafts sent for her by Miguel from San Francisco, nor wrote him a single line, although he at all times had the active management of her valuable properties in California; that when Ignacia was seized by her fatal illness and was lying desperately ill in Rome, deceased sent no word whatever to the Cebrians, who were then in Paris, and that the Cebrians were finally advised of Ignacia's condition only a day or two before she died by a note from Juanita de Laveaga, a cousin and companion of deceased; that during this illness of Ignacia, deceased took no part in the management of affairs or in the care of Ignacia; that Mr. Cebrian upon his arrival in Rome found her entirely helpless, and that she then began to occupy in the household of the Cebrians a similar position to that occupied by her with Ignacia's; that her sister, Mrs. Cebrian, was thenceforth the director of all her movements; that she was never consulted in regard to where she should go or what she should do, and went and did as she was instructed without protest or demur; that she never handled *in toto* even the income of her property devoted monthly to her support and use, the amount being given to Ignacia when she was with her, and to the Cebrians, when she was with them; that she never attempted to learn anything with relation to her property, or made any inquiry about it; that her brother Miguel had the actual custody of her stocks and bonds, she not even having a key to the safe deposit boxes in which they were

kept, and that he managed all her property as he would his own, except for such consultations as he might have with her brother Vicente while he was alive and with the Cebrians, and never consulted with deceased as to what should be done, and that she suffered all this without complaint, and indeed without any suggestion of interest in the matter; that she knew nothing about the extent and character of her property; that she signed her name when she was instructed to sign by Ignacia, or the Cebrians, or Miguel, to any paper presented to her for signature, of which there were many, including drafts, leases, deeds, bonds, and a power of attorney to Miguel, all without any inquiry whatever as to its nature or effect; that the gifts made by her to members of the family were practically made by those with whom she lived; that she never indicated her ability unaided to compose and write any paper beyond the simplest and most childish message, the few writings of any other character shown, exclusive of the alleged will, having been produced with great and laborious effort and under such circumstances as to indicate the aid and assistance of others.

There was opposed to this, it is true, the evidence of many reputable witnesses who, as "intimate acquaintances," testified that in their opinion deceased was of sound mind, and gave their reasons for their opinion. We cannot undertake to here enter into an analysis of the evidence thus given, for it would unduly lengthen this opinion to no useful purpose. What we have already stated as to the testimony on behalf of contestant shows that there was ample evidence to sustain the finding of the trial court as to the incompetency of the deceased to make a will, and it cannot matter that there was evidence opposed thereto, in view of the well settled rule that the determination of a trial court upon conflicting evidence is conclusive upon appellate courts. But it is proper to note that there was in the evidence introduced on behalf of proponents no successful attempt at contradiction on the part of those witnesses who were in a position to know the facts, of the testimony going to show entire acquiescence on the part of the deceased in the absolute management and disposition of her property and personal affairs going even to absolute control of her own movements, by her brothers and sisters, without consultation with her, from the death of her mother to

her own death. Nor was there any serious attempt on their part to explain this somewhat remarkable situation of affairs upon any theory consistent with the possession by deceased of a mind that had developed beyond that of a mere child. It is also worthy of note that, so far as we have been able to find, Mrs. Cebrian, the proponent of this will, and the person most intimately associated with the decedent for the last twenty years of her life, did not testify on the trial that she was of sound mind.

The evidence is likewise amply sufficient to sustain the finding of undue influence. Of course there can be no claim that the evidence does not sufficiently show the relation of trust and confidence between the deceased and the Cebrians, and the complete and perfect control of the deceased by them. There was certainly sufficient proof of interest and opportunity. The claim of learned counsel in this regard is that there was no proof that any undue influence was brought to bear directly upon the testamentary act. It is well settled that "undue influence, . . . must in order to avoid a will destroy the free agency of the testator at the time and in the very act of the making of the testament. It must bear directly upon the testamentary act" (*Estate of Higgins,* 156 Cal. 261, [104 Pac. 8]); "there must be substantial proof of the pressure which overpowers the volition of the testator at the time the will was made." (*Estate of Ricks,* 160 Cal. 461-2, [117 Pac. 537].) And to warrant the setting aside of a will on this ground there must of course be substantial evidence of the exercise of undue influence on the testamentary act. "Substantial evidence must do more than raise suspicion. It must amount to proof, and such evidence has the force of proof only when circumstances are proved which are inconsistent with the claim that the will was the spontaneous act of the alleged testator." (*Estate of Ricks,* 160 Cal. 462, [117 Pac. 537].) And it is said that the only evidence as to the execution of this will was that given by Mr. and Mrs. Cebrian, and that this evidence shows without conflict that there was nothing in the way of influence, undue or otherwise, attempted to be exerted upon deceased in the matter. But the court was not bound to accept as true the testimony of the Cebrians in this regard. If it was sufficiently made to appear that the deceased was absolutely incompetent

to understandingly and intelligently consider her property with a view to its proper disposition, and alone and unaided to compose and write the paper offered for probate as her will, to warrant the trial judge in so concluding, as we have seen is the fact, we have substantial proof of undue influence bearing directly upon the testamentary act; and in view of the testimony of Mr. and Mrs. Cebrian that they were the only persons present at the time of the execution of the will, taken in connection with the other matters to which we have referred, it is certainly a reasonable, if indeed not an irresistible, inference, that whatever undue influence was in fact exerted, was exerted by one or the other or both of them. In addition to the matters already stated as being shown by sufficient evidence, it is proper to note that the evidence shows that Mr. Cebrian was a man of education, and one with a considerable knowledge of law and legal forms; and also that the alleged will indicated on its face that in so far as the actual writing was concerned it was a laborious effort. As said by the learned trial judge: ''It is quite plainly the product of much manual exertion. If she was not following copy or taking dictation, she was certainly engaged in hard work in the writing of this will; it is not an example of fluency in penmanship nor of accuracy in spelling.'' It is also proper to take into consideration the improbability that deceased if she was of sound and disposing mind and memory, and not acting under undue influence, would have so discriminated against her brother, who, in the language of the trial judge ''had been a great service to her for many years and who had conserved her estate without the diminution of a dollar, indeed with increase and without retaining anything for personal benefit,'' and of whom, as the evidence shows, she was very fond.

The main complaint of learned counsel for proponent in the matter of rulings on evidence is that many extra-judicial statements were received as competent evidence upon the question of the mental competency of deceased. It is urged that in point of fact the case of contestant was made largely by such declarations, found generally in letters written in the course of correspondence between members of the family, and also found in other papers, and in the conduct and parol statements of certain members of the family. From the mass of evidence complained of in the opening brief in this connec-

tion, we have extracted the following as containing matters concerning which the claim of prejudicial error merits notice here.

A.  A great many letters written by Mrs. Cebrian to contestant prior to the death of deceased were introduced in evidence.  Mrs. Cebrian was called as a witness by the contestant.  She was examined as to matters referred to in a particular letter, and when she, in response to the questions of counsel for contestant, gave answers not in accord with statements contained in the letter, or failing to measure up to the same, the letter was offered in evidence and received over the objection of proponent's counsel to the effect that as a declaration of the witness it was incompetent against the other beneficiaries in the will, and therefore generally and wholly incompetent in the case.  This was the course pursued as to all the letters so introduced.  Most of the letters were free of matter as to which any claim of prejudicial error can reasonably be made.  Some of these letters, such for instance as exhibit 29, being a letter from Mrs. Cebrian to Miguel of date August 15, 1896, acknowledging receipt of a monthly draft for deceased, and advising him how much she will need per month for the future, were, we think, admissible as tending to show the actual transaction of the business of deceased by Mrs. Cebrian, a matter going to the acts and conduct of deceased herself.  Of course, the manner in which a person whose sanity is in question was treated by his family is not, taken alone, competent substantive evidence tending to prove insanity, for it is a mere extra-judicial expression of opinion on the part of the family (see *People* v. *Pico,* 62 Cal. 50, 53), but it is proper evidence when given in connection with the conduct of the alleged insane person under such treatment, as illustrating and explaining such conduct.  Absolute acquiescence by the person whose soundness of mind is in question in a course of conduct on the part of those around him with relation to his property and personal affairs which no person of sound mind would tolerate or acquiesce in, is competent evidence tending to show an unsound mind.  A great deal of the evidence received in this case was competent evidence along these lines.  And where, as was the case here during a large portion of the time, business of the person is transacted by others by means of letters and cablegrams from one to the

other, such letters and cablegrams constitute a part of the *res gestae* in the matter of the actual transaction of business. Among others, the letters referred to hereafter do probably contain what are in effect statements of Mrs. Cebrian going to show that she was of the opinion that deceased was mentally incompetent. Contestant's exhibit 1 was a letter written by her in Paris to Miguel, on April 19, 1888, shortly after Ignacia's death, in which she said, among other things: "Dear Miguel, do not take it badly that poor Maria does not write to you, the unfortunate one. You well know that she does not know how to write. If she had known how to write, they would not have concealed from me the state of sickness of Nacha."

In 1894, deceased's brother, Jose Vicente, died, leaving a will, the partial invalidity of which created a partial intestacy. An illegitimate son of another deceased brother, Jose Maria, alleged the right to participate as an heir, as the legitimate and adopted son of his own deceased father, in the estate of his natural uncle. Whether he was a son of Jose Maria, and if so, whether he had been so legitimated and adopted that he could inherit from the brothers and sisters of his father, were questions involved in the controversy that followed. The controversy in court was commenced by the filing of a petition for distribution on behalf of the surviving brother and sisters of Jose Vicente in the winter of 1896. The illegitimate son, referred to throughout these proceedings as Anselmo, answered this petition, setting up his claim to a portion of the estate. Shortly before the inauguration of this controversy in court, Mr. and Mrs. Cebrian with their family and deceased, hurriedly left for Europe, and remained abroad during the protracted litigation that followed, returning to the United States only in the month of December, 1903, and to San Francisco to live only when, in the early part of 1904, the controversy was finally terminated against Anselmo's claim of right to inherit from the brother and sisters of his natural father by the decision of this court on February 19, 1904. (*Estate of de Laveaga*, 142 Cal. 158, [75 Pac. 790].) It was the theory of contestant that the departure for and stay in Europe of the Cebrians with deceased during all this time was due to the fear on the part of all her relatives that proceedings to have deceased adjudged incompetent might be

CLXV Cal.—40

inaugurated against her by Anselmo if she remained in California, with the result that if the same were successful and Anselmo was further successful in obtaining a decree adjudging his right to inherit from any brother or sister of his father in the event that he or she died without making a valid disposition by will of all his property, he would necessarily inherit from deceased, because she could not make a valid will by reason of her incompetency; and, moreover, that any attempted disposition by deceased of any of her property by will would be ineffectual for any purpose. Many letters of Mrs. Cebrian containing statements tending to show this fear on her part, and a desire to conceal the real reason for their stay in Europe were received in evidence. For instance, in a letter to Miguel dated September 20, 1899 (contestant's exhibit 5), speaking of a proposed flying visit to California, she said, "but as it would not be prudent that Maria should go there" until the matter is finally decided, "I will have to leave her and go alone with Cebrian and the babies," and in a letter to Miguel dated August 28, 1897 (contestant's exhibit 6), she speaks of her children as "the pretext for being here" (in Europe), and that if she could leave the children in Europe "it would be a good pretext that Maria should remain with the children." In a letter to Miguel dated January 16, 1898 (contestant's exhibit 7), she says: "The only hope which I now see is the supreme court, and while that does not decide, it is impossible that Maria should return to San Francisco. . . . How many difficulties will arise then about Maria's return to San Francisco to be attacked and insulted by that malevolent, besides being robbed of her money? It shocks me and horrifies me to think of that which would happen." In a letter to Miguel dated December 28, 1897 (contestant's exhibit 10), she said: "but until the supreme court decides, the danger to Maria remains, that this man will get her in his claws in San Francisco. He will not wait until she dies to harass her in her life, as well as the rest of us." In a letter to Miguel dated June 10, 1897 (contestant's exhibit 12), she said that if they decide he is not able to inherit "it occurs to me that all of us will be able to return. Is it not so"? In a letter to Miguel dated December 7, 1897 (contestant's exhibit 17), she said: "I see that after the decision of Judge Coffey, Maria cannot return there under any circumstances

until the supreme court answers.'' Other letters showed her anxiety to enable deceased to escape the necessity of giving testimony before a commissioner in Europe to be used in such controversy, for fear that she would therein show her incompetency, and the successful efforts of herself and husband to prevent the same. The sum and substance of all these letters in so far as the question of any possible improper prejudicial effect is concerned, was that they constituted extra-judicial expressions of her opinion to the effect that deceased was in fact mentally incompetent.

B. Mr. Cebrian was likewise called as a witness by the contestant, and the same course was followed as to him as was followed with Mrs. Cebrian, with the result that extra-judicial expressions of his opinion to a similar effect were disclosed by certain of his letters received in evidence.

C. Upon the examination by contestant of Mrs. Cebrian as a witness, the will of the mother, Dolores de Laveaga, dated December 15, 1881, was received in evidence. The seventh paragraph thereof was as follows: ''Most fervently I charge my said executors with the care and protection of their younger sister, Maria Concepcion, as long as she may live.'' It is said that there was thus admitted the extra-judicial declaration of the deceased mother of deceased as to the competency of deceased.

D. Contestant's exhibit 39 was a settlement of account for chicken feed sold from the ranch near Hollister then owned by Ignacia, Mrs. Cebrian, deceased, Jose Vicente, and Miguel, signed by Ignacia as follows: ''I, for my account with M.'' (It was testified without objection that deceased took no personal part in this transaction.)

E. Contestant's exhibit 267 was a letter from Jose Vicente to Miguel, dated June 23, 1888. On her death-bed Ignacia was married to one Cervera, who asserted a claim under her will to a portion of her property. A settlement was finally effected with Cervera by the remaining brothers and sisters, except deceased, on behalf of all the brothers and sisters, including deceased, under which he was paid one hundred and sixty thousand dollars. The letter was written by Jose Vicente in relation to a proposed compromise, stating the terms thereof and assenting thereto, and among other things Jose Vicente said therein: ''I with you will take the responsi-

bility for Maria," a declaration, it is claimed, by Jose Vicente, to the effect that in his opinion deceased was incompetent.

F.   Contestant's exhibits 205 and 206 were two letters of Ignacia to Miguel, one dated March 11, 1887, the other January 21, 1887, when Ignacia and deceased were together in Europe.   In that of March 11, 1887, Ignacia said, among other things, after acknowledging a receipt of a draft for Maria for L. 308, and saying that thereafter he may send the money for deceased in the name of deceased, because if she signed once she could do so at other times.   "The observation I made was to save her who is short the pain of doing it before people; but if its more convenient for you the other way you can do so.   What is the word."   The Spanish word used in this letter for "short" is "corta," which apparently is equivalent to various English words, "short," "scanty," "small," "little," "*dull*," "*weak of intellect*," "*timid*," "short of words," "defective,"   In that of January 21, 1887, she had asked for extra money for Maria, specifying it and her needs, and had also said: "If at any other time I have to draw on you for Maria it will be better always to send me the money in my name, for you know her and to go to sign it at the bank or before a clerk the poor thing suffers.   When I telegraph you, if it is for me, I will tell you, and if it is for her, the same."   The claim is, of course, that these letters contained extra-judicial statements of the deceased Ignacia tending to show that she regarded deceased as being mentally incompetent.

G.   Parol testimony as to the contents of a letter accompanying the will of the father of deceased, who died in 1874, was received from Mr. Le Breton, the paper itself having been lost.   Mr. Le Breton testified that his recollection of the paper was that it recommended deceased to the care of her eldest sister, Maria Ignacia and Miguel, "on account of her weak mind," and that it requested them always to have her under their charge.   The claim is that there was thus admitted in evidence extra-judicial statements of the deceased father of deceased as to her competency.

H.   Encarnacion S. de Pena, a witness in Mexico, had written to contestant on December 15, 1909, saying among other things: "I knew your sister personally and had intimate relations with her from the time when she was very much of a

child. For that reason I assure you conscientiously that she was completely incapable of taking any determination for herself. I am ready and will have much pleasure in giving this testimony orally or as you may think necessary." Her deposition was subsequently taken in Mexico, and she testified that she was of Maria (deceased) no more than an acquaintance, that she had not formed an opinion whether she was of sound or unsound mind, and: "I say nothing of the opinion which I formed—considerations for the family prevent me from talking," and "I say nothing on that." On the question of competency she gave no testimony whatever. Thereupon, the letter, having been shown to have been written by her, was attached to the deposition. When the deposition was read in the trial court, this letter was admitted in evidence over proper objection that the same was incompetent, on the ground of surprise. Of course, it contained an extra-judicial statement of the lady as to the competency of deceased.

I. The correspondence between Mrs. Cebrian and contestant, and Mrs. Cebrian and J. V. de Laveaga, son of contestant, subsequent to the death of deceased and prior to the filing of the alleged will.

A. As to the matters referred to under the heading "A," viz.: the letters and conduct of Mrs. Cebrian indicating her opinion as to the competency of deceased: Although the aggregate amounts given to others than Mrs. Cebrian and Miguel by this will are a mere trifle in proportion to the total value of the estate, being only fifteen thousand dollars given to Clemente's children, six thousand dollars to Mrs. Cebrian for alms and masses, and "wearing apparel, furniture and jewelry" to two of Mrs. Cebrian's children, it is admitted that the rule declared in *Estate of Dolbeer*, 149 Cal. 227, 245, [9 Ann. Cas. 795, 86 Pac. 695], to the effect that a declaration of any number of legatees or devisees less than all upon the question of the mental competency of the deceased is not admissible in evidence on the issue of competency, is applicable as to the declarations of Mrs. Cebrian, executrix, proponent, and principal beneficiary. While there is some conflict in the authorities in other jurisdictions upon this general question, the great weight of authority appears to be in accord with the view declared in the Dolbeer case, as is shown by the authorities cited in the opinion. The conclusion is based prin-

cipally on the fact that the interest of the legatees and devisees under a will are several and not joint, and that it would be unjust under these circumstances to allow the interest of one to be affected by the admissions of another with whom he is not in privity. In *Estate of Dolbeer,* 153 Cal. 652, 662, [15 Ann. Cas. 207, 96 Pac. 266], it was held that the same rule holds where the evidence is addressed to the question of undue influence. This rule was followed in *Estate of Purcell,* 164 Cal. 300, [128 Pac. 932], decided December 10, 1912, and must be now accepted as the settled law of this state.

As against the general objection of incompetency for the reason we have stated, counsel for contestant earnestly assert that in no instance was any of such evidence as to admissions offered either for the purpose of showing a declaration against interest, or admission, or as independent evidence on the issue of competency or undue influence, or received by the trial court for any such purpose. So far as we have been able to find on an examination of the record, it appears to have been the opinion of the learned trial judge, as shown by his remarks in ruling on objections, that such evidence was not admissible as independent substantive evidence on the issues of incompetency and undue influence, and apparently he consistently sustained objections to questions calling for evidence that he conceived to be admissible on no other theory. And this, as we understand the record, was his attitude throughout the trial to all the evidence complained of on this score. Under these circumstances it would appear not to be a fair assumption for an appellate court to make that the trial judge considered the evidence for any other purpose than the purpose for which it was admitted, in coming to his conclusion upon the issues made by the pleadings. And this is so notwithstanding certain language used by the trial judge in his written opinion filed in deciding this case, which is pointed out by learned counsel for appellants.

The avowed theory upon which the evidence referred to under this head (A) was offered and received, was substantially, as we gather from the record, as follows: Mrs. Cebrian, the proponent, was a witness greatly interested against and extremely hostile to contestant. By reason of her long and intimate association with deceased, she was in a position to testify very fully as to her acts and conduct, a matter very

material to the issues.   Contestant had the right to assume
that she would give testimony on these matters in accord with·
her statements in the numerous letters he had received from
her.   He had the right to refresh the memory of the witness
with these letters.   On account of her interest and hostility,
he had the right to rigidly cross-examine her, and was entitled
to be given the widest latitude in such cross-examination, for
the purpose of enabling him to elicit the truth.   If, in response
to his questions, she gave evidence against him, he was entitled
to prove previous statements on her part inconsistent with her
present testimony, on the theory of surprise.   Furthermore,
he had the right to refresh her memory with these letters.

We are by no means prepared to hold that all the letters
complained of were admissible for any of the reasons specified.
None of the letters was admissible in evidence upon the theory
that it was necessary for the purpose of refreshing the memory
of the witness.   A paper used solely for such a purpose is in
no sense testimony, except in so far as it is testified to by the
witness to be true, and thus made a part of his evidence on
the trial.   As was said in *Estate of Packer,* 164 Cal. 525, [129
Pac. 778], "to permit this (the introduction of such letters
as evidence) to be done by the party producing the witness
would open the door to the admission of hearsay and manu-
factured evidence without limit."   The other party may, if
he sees fit, treat it as evidence after it has been used to refresh
the memory of the witness, but not the party using it for that
purpose.   (Code Civ. Proc., sec. 2047; *Estate of Packer,* 164
Cal. 525, [129 Pac. 778].)   Assuming that contestant had the
right on the ground of surprise to impeach Mrs. Cebrian by
showing that she had made, at other times, statements incon-
sistent with her present testimony (Code Civ. Proc., secs. 2049
and 2052), he had no right to show previous statements made
by her as to matters concerning which she failed to testify at
all on the trial, as for instance upon matters as to which she
said that she did not remember.   (See *People* v. *Creeks,* 141
Cal. 530, [75 Pac. 101], and cases there cited.)   And even
where in response to his questions she had given testimony
against him, he was not entitled to impeach her by showing
previous inconsistent statements as to matters that were purely
collateral or irrelevant.   (See *Jordan* v. *McKinney,* 144 Mass.
438, [11 N. E. 702].)   And the test whether a matter is col-

lateral has been put as follows: "Could the fact as to which the inconsistency is predicated, have been shown by evidence by other witnesses, independently of the inconsistency." (1 Greenleaf on Evidence, sec. 461f.)

Some of the letters were admissible for the purpose of impeachment. For instance, contestant's exhibit 1, hereinbefore referred to, was so admissible. The matter upon which Mrs. Cebrian was then being examined was the question whether deceased had written to her as to Ignacia's desperate sickness, a matter clearly material and competent upon the issue of competency. She had given testimony against contestant upon this proposition, and statements in her letter (exhibit 1) were clearly inconsistent with her testimony on the trial upon this subject. Limited to purposes of impeachment upon the inconsistent testimony, the letter was admissible. We cannot say the same as to some of the other letters, as for instance letters introduced to impeach her as to the reasons first given by her on the trial for the departure and stay in Europe during the Anselmo litigation. Whether she did this to avoid the scandal or because of fear of incompetency proceedings against deceased was surely a purely collateral matter. But so far as we have found, it is true, as claimed by counsel for contestant, that no objection other than the one stated was interposed to any of the letters of Mrs. Cebrian, and the precise objection we have just mentioned, viz.: that it was an attempted impeachment on a collateral matter, was not suggested. Under the circumstances appearing in the record before us, we are satisfied that the general objection already stated was not sufficiently specific to call to the attention of the trial judge the special objection to such testimony when offered for purposes of impeachment.

But, as we have suggested, it appears to us that the only possible prejudicial effect of any of the statements of Mrs. Cebrian erroneously shown was that they tended to show that she expressed herself at various times substantially as entertaining the opinion that deceased was mentally incompetent. We have read the whole of the examination of this witness, as the same is set forth in the reporter's transcript of his shorthand notes, and it seems to us very clear that, assuming such to be the effect, such statements as may reasonably be claimed to have been erroneously admitted in no substantial degree

added to the showing to the same effect that is made by such
portions of her testimony as either were given without objec-
tion or properly admitted over objection.

B.  What we have said in regard to the matters discussed
under the heading "A" is equally applicable to the evidence
referred to under this head, letters and acts of Cebrian.

C.  This relates, as we have shown, to the admission in evi-
dence of the seventh paragraph of the will of the mother of
deceased, dated December 15, 1881, already set forth.  The
will was avowedly offered in evidence as impeaching evidence.
Mrs. Cebrian had testified in response to questions put by con-
testant that she was very sure that the mother had not made in
her will any request of the children for the care and protec-
tion of deceased.  Thereupon the will was offered in evidence
by Mr. Pillsbury "upon the ground that I am taken by sur-
prise, because the document contains exactly such a request
as the witness has disclaimed."  The general objection here-
inbefore referred to that the same was incompetent for the
reason that the beneficiaries are not bound by the extra-judi-
cial declaration of the mother was made, counsel for contest-
ant replied that he offered it on "the same grounds, the same
purposes," and the objection was overruled.  After the paper
had been received and read in evidence, counsel for proponent
made a motion to strike out the will upon "this further
ground" that counsel could not "meet a question of surprise
when the question upon which that is predicated is itself in-
competent," in other words, that the attempted impeachment
was upon a collateral matter.  The motion was denied.  We
think that this would have been a good and sufficient objec-
tion to the evidence if made prior to the admission of the will
in evidence.  In line with what we have already said, we
think that in view of what was said as to the purpose of the
offer, this precise objection should have been called to the at-
tention of the trial court, and that the objection made was
not sufficiently specific to do this.  Strictly speaking, the
court is not compelled to strike out evidence received without
a sufficiently specific objection, where such objection was prac-
tically available to the party before the admission of the evi-
dence (see generally *People* v. *Scalamiero,* 143 Cal. 343, [76
Pac. 1098] ; *People* v. *Nelson,* 85 Cal. 421, 425, [24 Pac.
1006]), and may refuse to do so in the exercise of a reason-

able discretion. In *People* v. *Nelson,* 85 Cal. 421, [24 Pac. 1006], it was substantially said that a motion to strike out will not be entertained where no objection was taken prior to the answer, and this, of course, means a sufficiently specific objection. Moreover, the record sufficiently shows that the court in making its ruling overruling the objection was not receiving the will as substantive evidence on the issue of competency but solely for the purpose for which it was offered, viz.: the purpose of impeachment of Mrs. Cebrian as a witness, and to meet her previous testimony that there was no such request on the part of the mother. It is further to be noted that without objection Mr. Cebrian gave testimony of his understanding that it was the intention and wishes of the father and mother of deceased that she should be protected more than the other children. It is further to be noted that the language of the seventh provision of the will does not contain any expression in terms referring to any mental incompetency on the part of deceased, nor is the language of such a nature that it necessarily implies that Mrs. de Laveaga so thought.

D. Contestant's exhibit 39 was offered and received in connection with Mrs. Cebrian's evidence that Ignacia did not attend to the business of deceased. It is claimed that it was proper impeaching testimony. Independent of this, we are of the opinion that, as suggested by counsel for contestant, it was admissible in evidence as one of very many writings tending to show the actual transaction at all times after her mother's death, by her relatives, of all the business and personal affairs of deceased, without consultation with her at any time, which, taken in connection with her acquiescence therein, constitutes evidence material and competent on the issue of mental competency. It was further expressly shown without objection that deceased took no part in this transaction.

E. Contestant's exhibit 267, the letter from Jose Vicente de Laveaga to Miguel, of date June 23, 1888, relating to the Cervera compromise; this letter, with other evidence relating to the same matter, was admissible, we think, as tending to show the actual assumption by all the other parties interested, except deceased, of the responsibility of arranging and closing the Cervera compromise, by which her estate was charged with forty thousand dollars, without any consultation whatever with her, and without bringing the matter in any way to her

attention. That she was entirely ignored in so far as any attempt to ascertain whether the same was satisfactory to her is undisputed. The evidence is like a great mass of other evidence along the same general lines, viz.: Evidence tending to show a long continued and uniform course of treatment of deceased as to her business and personal affairs by her relatives, under such circumstances as to make her necessarily implied voluntary acquiescence evidence material on the question of mental competency.

F. Contestant's exhibits 205 and 206, being two letters from Ignacia to Miguel: As in the case of contestant's exhibit 39, under heading "D," both of these letters were in part admissible as a portion of the line of evidence showing the actual transaction of the business of deceased by her relatives, even that business relating to the receipt and expenditure of moneys for her own personal needs. As to the letter of January 21, 1887, a portion of which was "for you know her and to go to sign it at the bank or before a clerk the poor thing suffers," this being the only portion as to which objection may reasonably be made, the objection of incompetency was to the whole letter, and was therefore properly overruled. No motion to strike out such objectionable portion was made, nor was the attention of the court called at any time to any particular portion as being specially objectionable. So there was no error in regard to this exhibit. It is to be noted that Ignacia did not here say anything as to the nature of the infirmity of the deceased. The letter of March 11, 1887, contained an objectionable expression of opinion as to deceased on the part of Ignacia as to the mental competency of deceased, if the word *"corta"* be taken as meaning "short of intelligence," instead of "timid," and as we gather from the record such was the meaning attributed to it in the proceedings in the court below. As with the letter of January 21, 1887, the formal objection here was to the whole of such portion of the letter as was offered, but after some discussion and before the ruling counsel for proponent said: "Now the portion of this letter here read contains matter which we think is objectionable, and we object to it, and we ask if there be an answer that it go out." The trial judge recognized that a portion of the matter was objectionable, so saying, but said it was so "inextricably interwoven with other matter that you cannot separate one without de-

stroying the whole of it," and overruled the objection. We
are of the opinion that the objectionable portion was plainly
apparent and could easily have been eliminated, without de-
stroying the whole, and that it should be held that a sufficient
objection was made to the objectionable portion, "the observa-
tion I made was to save her who is short the pain of doing it
before people." We see no force in the claim made by learned
counsel that this portion of the letter was admissible on the
ground that other portions of the letter contained a declara-
tion by Ignacia against her own interest. But conceding all
that we have said, we have seen that the learned judge of the
trial court expressly recognized that this statement in the
letter was objectionable, and was not competent evidence. It
is not then to be assumed that he gave this declaration of
Ignacia any weight in determining the issue of competency.
In fact, in view of his statements, the contrary must be as-
sumed. So that it cannot properly be held that appellants
were prejudiced by the ruling. Learned counsel for appel-
lants point out in regard to this, as in regard to other matters
claimed to have been improperly shown, that the trial judge
referred to this declaration of opinion by Ignacia in his writ-
ten opinion filed in this case. This opinion is not a part of
the record before us on appeal, and, as has often been held,
could not properly be made a part of such record, or consid-
ered by us as indicating what operated upon the judge's mind
in coming to a conclusion upon the ultimate facts of this case,
even if the same were attempted to be certified to us as a part
of the appeal record. So far as the official record on appeal
goes, it shows that the trial judge did not receive this incom-
petent declaration as evidence on the issues made by the plead-
ings, and warrants the conclusion that he did not consider it
in determining these issues. And even if the trial judge in
the unofficial paper filed by him called his "opinion," did
refer to this declaration of Ignacia as one of the things tend-
ing to show incompetency on the part of deceased, it by no
means necessarily follows that he considered such declaration
in determining the issue of competency. The "opinion" is
incompetent evidence on the matter as to which learned coun-
sel seek here to use it.

G. The testimony of Mr. Le Breton as to the contents of the
letter of the father, accompanying his will, in which he recom-

mended deceased to the care of her eldest sister, Ignacia, and
to Miguel, ''on account of her weak mind,'' and requested
them to always have her under their charge.   Sufficient proof
of the loss of this instrument was made to authorize oral tes-
timony of its contents, if proof thereof was competent.   The
testimony came in as part of the conversation at a meeting of
the members of the family following the father's death, when
the will and the letter were read aloud, and a conversation
had by those present as to the course to be followed, especially
as to whether this letter need be filed with the will.   Deceased
was present, and the reading and conversation were in her
presence and hearing.   She was then over seventeen years of
age.   The testimony tends to show that in this conversation
the wish was expressed that it be not filed, as it was desired
that it should not thus be publicly expressed that deceased was
weak mentally.   There was uncontradicted testimony given
without objection to the effect that deceased sat absolutely
silent throughout this conversation, ''not taking part in the
discussion at all, apparently accepting what was said, not tak-
ing part in the subject at all.''   The trial court in admitting
the evidence expressly declared substantially that it was re-
ceived as part of the conversation in the presence and hearing
of deceased, in connection with her conduct at the time.   We
cannot doubt that it was legally admissible under the circum-
stances.   The conduct of a person past the age of childhood
and within a few months of the age of majority, at a family
gathering where in her presence and hearing her mental com-
petency is being discussed and the claim asserted and appar-
ently accepted by all present that she is so weak minded as to
need the guardianship and care of others throughout her life,
and it is being discussed whether or not a writing expressing
the view that she is so affected shall be made a public record,
is some evidence on the question of her competency at the
time.   Naturally such a person if normal in mind would ordi-
narily show under such circumstances some interest in the
subject matter, even to the extent of expostulation.   That the
occurrence was somewhat remote under all the circumstances
goes only to the weight to be accorded the evidence, and not
to its admissibility.

H.   The letter of Encarnacion S. de Pena to contestant, at-
tached to her deposition: We see no good answer to the claim

of proponent that this letter was improperly received in evidence. Sufficient objection was made in the trial court. It was admitted by the learned trial judge on the ground of surprise. The only surprise was that the witness had failed to give expected testimony *in favor* of contestant. She had not given any evidence *against* him. It is suggested that on the question whether she was an intimate acquaintance of deceased, she had testified to the effect that she was not, which was opposed to the statements in her letter. But the question of intimacy was material only in the event that she gave testimony on the subject of her opinion as to the competency of deceased, which she did not do. It must be held that the expression of this lady's opinion that deceased "was completely incapable of taking any determination for herself" was improperly received in evidence.

I.    Certain correspondence between Mrs. Cebrian and contestant, and Mrs. Cebrian and J. V. de Laveaga, son of contestant, subsequent to the death of deceased and prior to the filing of the alleged will: The correspondence between Mrs. Cebrian and her nephew, J. V. de Laveaga, received in evidence was of such a nature that it cannot be conceived that appellants could be prejudicially affected thereby. Some of the correspondence between Mrs. Cebrian and contestant was admissible and impeaching evidence on the matter of the execution of the will by deceased, as to which she testified fully and specifically. As to such portions as to which objections may reasonably be urged, no prejudicial effect is reasonably conceivable. There was in the correspondence and papers emanating from Mrs. Cebrian, so far as we have been able to find, no admission either of incompetency on the part of deceased or of facts tending to show undue influence. In so far as the letters emanating from contestant are concerned, any assertion bearing on the question of the competency of deceased was in substance the same as his testimony on the subject given under oath upon the trial. We are of the opinion that nothing appears in this connection that warrants the claim of prejudicial error.

Another matter referred to in the briefs merits consideration here.

It is earnestly urged that on the redirect examination of E. J. Le Breton, his own witness, contestant was allowed to

put in evidence much incompetent matter bearing upon the question of mental competency. Much of this matter so complained of was contained in the deposition of Le Breton taken before the trial. The statements in the respective briefs of counsel as to exactly what happened on the trial in regard to this matter are so variant, that it has been somewhat difficult for us to ascertain the facts. Le Breton was called as a witness on the trial by contestant. He was a brother-in-law of contestant, his sister, now deceased, having been the wife of contestant, and was at the time of the death of the father of deceased and ever since on very intimate terms with the members of the de Laveaga family. With his opportunities for observation of the deceased from childhood he was an exceedingly important witness on the issue of mental competency, and his testimony was very strong in favor of the theory of incompetency. On his cross-examination on the trial, the fact was referred to that when he was appointed receiver of the California Safe Deposit and Trust Company on January 14, 1908, he tendered for approval and had approved by Judge Coffey, a bond for one million dollars, on which deceased was a surety in the sum of five hundred thousand dollars. His attention was called by proponent to his deposition, and certain questions and answers contained therein were read to him and he was asked if those questions were then asked of him and if he gave the answers therein set forth. He answered that he so testified. We set forth some of these questions and answers so read by proponent:

"Q. Mr. Le Breton, will you explain to me why it was that you knowingly presented to the judge of the superior court of the city and county of San Francisco, for his approval, in a case where the bond had been fixed at two million dollars— A. (Intg.) One million. Q. At one million dollars, sureties qualifying here for two million—can you explain to me why you presented for approval to the judge of the superior court of the city and county of San Francisco such a bond, upon which one of the sureties qualifying for half a million · dollars, was a woman of unsound mind? Why did you do that thing to the court? A. I did it because in the opinion of my attorney, it was a good bond. Mr. M. A. de Laveaga was business manager of the affairs of his sister, and in my judgment it was a good bond, . . . and because as a matter

of fact it was all done in the best of faith. . . . Q.  At the
time this bond was presented to Judge Coffey for his approval,
with your knowledge, did you think that that bond was an
enforceable bond against Maria C. de Laveaga?  A.  I did.
. . . Q.  Why?  A.  On the ground that she had never been
legally declared incompetent; that she had in her own name
a great deal of property; that it was done upon the advice of
her brother and business manager; the whole thing was done
in the best of faith, and I felt then, as I do now, that it was
an enforceable bond in view of the conditions and circum-
stances.  You have asked me a question which, of course, may
be far reaching, and I will ask for permission to develop it.
Q.  Certainly.  A.  Miss Maria C. de Laveaga, as I stated
before, was of feeble mind.  She was a living human being.
For good, she was easily influenced; for evil, easily influenced.
It does not follow that the act was wrong since it was done
in perfect good faith, and was done by somebody who knew
her, was her director in what she did, and she had never been
declared incompetent.  Much property had been deeded by
her attorney in fact, M. A. de Laveaga, and he knew, and his
sister knew, Mrs. Cebrian, who was present, and knew of those
acts she was about to do, and she acquiesced in them.  Q.
You speak of director, you mean M. A. de Laveaga?  A.  Yes,
sir.  I mean M. A. de Laveaga, and in view of the fact that
he acted for her, in her name, directing her affairs, I believe
that he had the right and the authority to direct her to sign
such a bond. . . . I thought it was better that it should remain
in the members of the family, and felt at liberty to call upon
the de Laveaga branch, since several members of that family
were beneficiaries or derived benefit from the receivership,
and from the hard labors which I expected to perform.  Q.
Mr. Le Breton, did you at the time that this bond was ap-
proved think in your own mind that the half million bond of
a woman of unsound mind was an enforceable obligation?  A.
I felt that the bond executed by Miss Maria C. de Laveaga,
when I signed that bond, was an enforceable obligation.  Q.
I would like you to answer my general question, which I think
is a proper one, and to answer it categorically, if you can.
Did you at the time this bond was approved, to wit, on the
20th day of January, 1908, think in your own mind that the
half million dollar bond of a woman of unsound mind was an

enforceable obligation? . . . A.   I was not called upon to pass
upon hypothetical, leading questions, but was called upon to
pass upon in my own mind, conscientiously, whether that
was an enforceable bond signed by Maria C. de Laveaga, and
my conclusion in my mind was that it was. . . . Q.   Mr.
Le Breton, at the time that you presented this bond to Judge
Coffey for his approval, at the time when it was presented to
Judge Coffey for his approval with your knowledge, did you
think at that time in your own mind, if you had told him you
thought she was of unsound mind, he would ever have ap-
proved the bond? . . . A.   If I had mentioned it to him, the
conditions that surrounded Miss Maria C. de Laveaga, and
the conditions surrounding the execution of the bond, I am
satisfied he would have approved it.   Q.   Did you make any
such explanation to him?   A.   I did not feel called upon,
because Judge Coffey had so many times every member of the
de Laveaga family in his court, for so many years, that he
knows all about—or at least I infer he does, and should know
all about the members of the de Laveaga family.   He has had
them before him in the greatest minuteness many times.   Q.
Did you ever tell him, or did you ever tell any of the stock-
holders or creditors of the California Safe Deposit and Trust
Company that one of the persons on your bond, and for half
a million dollars, was a woman of unsound mind?   A.   There
was no occasion for me to tell them anything about it, because
the matter did not concern them.   It was a matter for the
judge of the superior court.''

There appears to have been a claim made by counsel for con-
testant on the redirect examination of this witness, that by
reason of these references to the deposition on cross-examina-
tion, they were entitled to put the whole deposition in evi-
dence.   In fact, such an offer was made, but the trial court
refused to admit it.   Of course, there was no force in this
claim.   No part of the deposition had been put in evidence
by proponent.   It had simply been used by proponent in
cross-examining the witness, to call his attention to certain
statements claimed to have been previously made by the wit-
ness and to ask him if he had so stated.   In so far as the state-
ments thus called to his attention and testified to as having
been made by him were incomplete or misleading in themselves

CLXV Cal.—41

unless considered in connection with other statements by him in the deposition in the same connection, it was open to the contestant to show that in connection with the matters already called to his attention, he had stated the other matters, thus giving his whole statement on the subject, in order that the language first called to his attention might be given the effect intended by the witness in uttering it. We do not understand that the law authorized contestant under the circumstances appearing here, to use the deposition of this witness for any other purpose. As a matter of fact contestant did read to the witness large portions of the deposition, and generally followed this reading by asking him if he then testified in the manner thus indicated. We think some of the matters thus elicited cannot be held to have been at all necessary to explain or complete the answers elicited by the cross-examination.

Preliminarily it should be stated that as to the matters particularly referred to in appellants' reply brief in this connection, viz.: the matters in the deposition set forth between pages 1294 and 1314 of volume 3 of the opening brief, contestant's counsel are correct in their claim that the only question answered by the witness was "Now I will ask you at this point if that was the litigation which you referred to as having been before Judge Coffey and with which he was familiar"? (Vol. 3, Trans., p. 1166.) The portion already read was in reference to the Anselmo litigation. The answer was "It was." (Vol. 3, Trans., p. 1168.) That portion of the deposition was not put in evidence, and the witness did not testify that he gave that testimony on the taking of his deposition, that is if the official record of the official reporter, certified by the trial judge, is to be here taken as stating the facts. Of course contestant was entitled to show in explanation of the witness's answer on cross-examination as to litigation before Judge Coffey, that it was the Anselmo litigation to which he referred.

But in so far as the claim of prejudicial error in this matter is concerned, as well as in other portions of Le Breton's cross-examination, including some relating to the deposition, we are of the opinion that the record furnishes another sufficient answer. The substantial effect of all the matters complained of, so far as any possible claim of prejudice is concerned, was that they tended to show the uniform assumption by all the

members of the family that deceased was mentally weak and incapable of managing her affairs; the constant desire on their part to prevent any disclosure of that fact to the public; and the fact that while recognizing her incompetency they nevertheless, for the purpose of protecting her both as to person and property, and preventing a disclosure of her incompetency and a consequent necessity for the appointment of a guardian, adopted and uniformly carried out a policy of having her business transacted in her own name, under their immediate personal supervision and direction, with the understanding that they stood behind and in support of everything that was thus done. Such matters, if known to Le Breton at the time he gave his bond with deceased as a surety thereon, were material in answer to the attempted impeachment of his testimony that deceased was incompetent, by showing that he had presented a bond with her as surety thereon for five hundred thousand dollars, without intimating to the judge that she was an incompetent person. It goes without saying that such an act on his part, unexplained, would strongly impeach his testimony previously given that she was not competent, and learned counsel for proponent insisted upon showing that fact clearly and in detail on his cross-examination. We have already set forth the questions asked in this regard including "Why did you do that thing to the court?" and "Did you think that that bond was an enforceable bond against Maria C. de Laveaga?" to which the witness answered that he did so think, "Did you at the time that this bond was approved think in your own mind that the half million bond of a woman of unsound mind was an enforceable obligation?" to which he answered that he thought this bond of deceased was valid, and the concluding questions "Did you think at that time in your own mind that, if you had told him (Judge Coffey) you thought she was of unsound mind, he would ever have approved the bond?" and "Did you make any such explanation to him?" which he answered by saying "If I had mentioned to him the conditions that surrounded Miss Maria C. de Laveaga, and the conditions surrounding the execution of the bond, I am satisfied he would have approved it," and "I did not feel called upon, because Judge Coffey had so many times every member of the de Laveaga family in his court, for so many years, that he knows all about, or at least I infer he

does and should know all about the members of the . . . family.'' He had also previously been asked on cross-examination whether contestant had not asked his advice in relation to the management of the property of deceased, and whether he did not know that contestant had her general power of attorney, and answered both questions in the affirmative. While the matters already st.. ed as being the general effect of the evidence elicited might not be a justification for the action of the witness in presenting to Judge Coffey a bond with deceased thereon as a surety without explaining to the judge all the facts in regard to her, if he then believed her to be mentally incompetent, they did afford a reasonable explanation of such conduct entirely consistent with his testimony on this trial that he was of the opinion that she was so incompetent, and one that might reasonably be taken as consistent with his answers on cross-examination that he believed the bond to be an obligation in fact enforceable in so far as her part thereof was concerned. If this be so, contestant was entitled to show such matters in reply to the attempted impeachment. If he could show this independently of the deposition, we do not see that it makes any practical difference, so far as the question of prejudice is concerned, that he showed it by reading the questions and answers of the witness contained in the deposition in regard to these matters, and asking the witness if he so testified, as was done in regard to a portion of the examination in this connection. The matters referred to were perhaps gone into with much more of detail than was necessary, but the whole effect of the testimony elicited was substantially as we have stated.

As to such other matters as are specially called to our attention by learned counsel for appellants, we find nothing that we deem a sufficient basis for a conclusion that there was prejudicial error.

Our consideration of the record in this case has brought us to the conclusion that the order of the trial court should be affirmed. Of course, some errors in rulings on evidence were committed in the trial court. It could not reasonably be expected to be otherwise in view of the great length of this trial, the nature of the questions involved, the mass of testimony presented and the earnestness with which the conflict was waged in the trial court, with counsel on both sides of infinite

resource and great ability. But we are of the opinion that there were not technical errors of such a nature and of sufficient importance in their results, taking into consideration all the circumstances shown by the record, to warrant us in requiring a new trial. For instance, it cannot reasonably be conceived, under the circumstances of this case, that the extrajudicial expression of opinion on the part of Encarnacion S. de Pena, improperly admitted in evidence by way of impeachment, on the ground of surprise, hereinbefore set forth, in any degree affected the determination of the issues by the trial court. So far as the merits of the case are concerned, our examination of the record has satisfied us that the evidence properly admitted amply warrants the conclusion of the learned trial judge both that deceased did not have the sound and disposing mind and memory essential to the making of a last will, and that the alleged will was the result of undue influence.

The order appealed from is affirmed.

Shaw, J., Lorigan, J., Henshaw, J., Melvin, J., and Sloss, J., concurred.

Rehearing denied.