[L. A. No. 4134.   Department Two.—February 28, 1916.]

In the Matter of the Estate of JOHN NEWTON STONE, Deceased; LEO STONE GREEN, Respondent, v. FANNIE E. STONE, MRS. S. W. MERRILL, F. E. YOAKUM, Appellants, and MARGARET GREEN, by WILLIAM GREEN, Her Guardian ad Litem, Respondent.

WILL—CONTEST—UNDUE INFLUENCE—MOTION FOR NEW TRIAL.—In a contest instituted by a daughter to revoke the probate of a will leaving the entire estate, except a pecuniary legacy of nominal amount to the daughter, to the widow, who had been married to, and lived happily with, testator for thirty-nine years, there being no question of the sanity of the testator, the evidence before the court was held insufficient to support the verdict of undue influence, and the order refusing a new trial was therefore erroneous.

APPEAL from a judgment of the Superior Court of Los Angeles County, and from an order refusing a new trial. Frederick W. Houser, Judge.

The facts are stated in the opinion of the court.

Hartley Shaw, and Kemp, Mitchell & Silverberg, for Appellants.

Joseph Scott, for Respondent.

HENSHAW, J.—John Newton Stone died on January 3, 1914. By his will he left the greater part of his property to his widow, Fannie E. Stone, to whom he had been married and with whom he had lived for thirty-nine years. The major portion of his estate consisted of the home upon which they had lived for twenty-four years. Eight months before his death, and on the day before his departure with his wife for a visit to eastern relatives, he had executed his will. Subsequent to its execution and up to a very short time before his death he had enjoyed fairly good health. His last illness was no more than a week in duration and he died quite suddenly. Besides his widow he left a married daughter, Leo Stone Green, who instituted her contest when her father's will was offered for probate by her mother. Leo Stone Green had been remembered in the will and left a legacy in the sum of fifty dollars. At the time of the institution of the contest she was thirty-four years of age, was living with her husband, and was the mother of one child, Margaret Green, who through her guardian *ad litem* joined the mother in the contest. The only issue submitted to the jury was whether or not the execution of the will had been procured by the undue influence exercised upon the testator by his wife, the mother of contestant, Fannie E. Stone. The jury's verdict was in favor of the contestant and judgment followed denying probate to the will. Proponent moved for a new trial. The motion was denied. From the order denying it and from the judgment the proponent appeals, two other beneficiaries under the will joining in her appeal.

Contestant charged upon two grounds of contest—insanity as well as undue influence. Proponent moved for a nonsuit for the insufficiency of the evidence to support either ground. The court granted the motion as to the asserted ground of insanity and withdrew that from the consideration of the jury, finding that the deceased was of sound and disposing mind, that he had no insane "delusion or prejudice as to the contestant's husband," that "his mind was not weak, debilitated or deranged," and that "he was not incompetent to make a will." The consideration of the asserted exercise of undue influence, therefore, is not complicated by evidence of enfeebled condition or senility. The testator was sixty-one years old at the time of his death.

The gravamen of proponent's complaint upon this appeal is that there is no evidence, not even a scintilla, justifying the verdict of the jury that the will was the product of undue influence exercised upon the testator by his wife. This proposition of necessity involves a presentation of the evidence offered and admitted on behalf of contestants. But preliminary to that presentation we are impelled to say that never within our experience or our reading have we known of a case where a will was overthrown upon evidence so baseless and unsubstantial as that here presented. The case affords a surprising illustration of the power with which some juries think they are clothed of remodeling the dispositions which a testator makes to conform with their own ideas of what he should have done.

What, then, is the evidence? In April, 1913, testator and his wife had planned a trip east to visit relatives. The date of their departure was fixed upon. The day before leaving, on April 30th, Mr. Stone went to the office of Mr. Griffin, an attorney of Los Angeles, and requested Mr. Griffin to prepare for him his will, dictating to Mr. Griffin its terms. He went alone. Mr. Griffin caused the will to be drafted in accordance with the expressed intent of Mr. Stone, and when the draft had been prepared Mr. Stone, returning to the office, executed the will. Mr. Griffin was not present at the execution. The will was witnessed by two other men in the office. By its terms the will bequeathed, with the exception of minor legacies, all of the property to the widow. The daughter was given a legacy of but fifty dollars. After the execution of the will Mr. Stone stated to one of the witnesses that he would put the will in his safe deposit box. He took the will away and in a short time returned and gave the key of the box to the witness, and this key remained in his possession until after Mr. Stone's death. He stated to Mr. Griffin, in explanation of the small legacy left to his daughter, that he was not pleased with her marriage and that his wife would provide for her. His wife did not accompany him to the lawyer's office when the will was prepared, and testified that she did not know that the will had been executed until that evening, when her husband informed her of its execution and of its contents. After her husband's death she went for the first time to the office of Mr. Elijah, the witness, and asked him about her husband's will. The first time

she ever saw the will was when it was taken from the safe deposit box after Mr. Stone's death. She had made no suggestions to Mr. Stone as to the disposition of his property.

The home of the family was a ranch, upon which the father, mother, and the contestant, Leo Stone Green, lived together until after her marriage. There was also an older bedridden daughter, who died before the execution of the will. The contestant had lived with her parents until she was twenty-three years of age. She had been educated by them in music, German, and French. In part she had been educated by her mother, who took her out of the public school because she did not think the school children were fit for her child to associate with. Her parents were ambitious for her and desired her to marry a rich man in their own social sphere. Her husband, Mr. Green, was a horse-trainer, at times employed by her father to break his horses. He was without means, and was regarded by the family as inferior in education, breeding, and social standing. When about twenty-three years of age the contestant became unduly intimate with Green and was with child by him. This was a great blow to her parents, who assented to a marriage between them as the only solution of the problem. Her first child was born a month after her marriage. At the time of the birth of this child she was at her parents' home when overtaken by her labor pains. Her mother made light of her sickness. The daughter asked that Dr. Wise be summoned and her father went to get him. Her husband was absent at the time. Her mother told her that she had "better pray that you and the baby both die." The doctor was slow in arriving, and her baby was born at 1 o'clock, without any attendance. Her mother covered her with a blanket and told her that she did not know how to minister to her, and objected to a woman, a neighbor, being called in for the purpose. The doctor arrived about 4 o'clock. The baby lingered six days, never opening its eyes. Her father cried bitterly at the funeral, because it was the first death in the family. She was ill for some time after the birth of this child and her father was willing that a nurse should be called in to attend her, but her mother objected.

Contestant by interrogation was carried back over the history of her early life, and testified that her mother insisted upon her aiding in the care of the bedridden sister, and fre-

quently beat her for her remissness. When thirteen years of age she refused to obey her mother's directions to attend to this sister and the mother switched her with a rawhide riding whip until she was black and blue wherever the whip struck her. Upon another occasion, when a little girl, she had run away from home and her mother tied her to a bedpost to keep her from running away. When at the age of thirteen her mother had whipped her, as above described, she told her mother that she would never permit her to whip her again. Touching the conduct of her father toward her, she testified that when she was thirteen years of age her father was angry because a neighbor who had purchased hay from him had not come at the appointed time to take it away. She expostulated, saying to her father that he would come, when her father began to curse her, "cursed me clear out into the yard." Upon another occasion, when she was attending school, she asked her father for twenty-five cents for carfare. He became angry, shook his fist in her face, and said, "Now, you cry and spoil your pretty face, just cry." In this presentation of her home life thus given by contestant, if it appears that her parents were severe or harsh with her, it also appears that they were equally so, and that the father's conduct toward his daughter was not influenced by the mother.

With this outline of her home life, and with the brief comment which we have made upon it, we come to what is, after all, the one essential consideration—the evidence of undue influence exercised by the wife over the husband, which undue influence to avoid the will must have had a controlling effect upon its execution. The effort of contestant in this regard is not even remotely directed to any showing of undue influence exercised upon the testator at the time of the making of the will. Indeed, from the circumstances attending its making, and from the clear and abundant evidence in regard to it, the effort would be futile. The evidence, however, is directed and designed to show such a continuous domination by the wife over her husband as to force the conclusion that he was a mere puppet in his wife's hands, and lived and had his being under her orders and directions. We will not attempt to set forth all of the paltry and trivial acts which it is contended show such a tremendous domination. Enough, however, will be set forth to illustrate their charac-

ter: Mrs. Stone was not a good housewife—she did not wash the dishes or make the beds—and her husband, without avail, complained of her carelessness in this regard. Many husbands do the same. She objected to Mr. Stone making his eastern trip alone and insisted that he take her with him. Many wives do the same. She objected to Mr. Stone sending any considerable sum of money to his eastern relatives, and insisted that the amount be small. Such a condition of things is not unusual between spouses. She objected to Mr. Stone selling the ranch. It cannot be said that a wife is not entitled to lift her voice in such a matter. She desired an automobile and had Mr. Stone sell some horses that it might be purchased. Many husbands have done the same thing. She objected to her daughter accompanying them on their last eastern visit. To get a bedstead into a room he sawed off one of its legs because his wife wanted it done. The leg was afterward glued on, but the appearance of the piece of furniture was spoiled in the opinion of the contestant. When Mr. Stone thought his daughter should continue in the public school, Mrs. Stone took her out and taught her at home. She objected to Mr. Stone selling a certain horse named Adelaide, and Mr. Stone did not sell it. She induced Mr. Stone to stop smoking, but, at his later request, permitted him to resume the practice. He complained in the presence of a neighbor that the cat had killed the canary bird, and upon Mrs. Stone's intimation that he would better stop talking about it he did stop. Few husbands would have done differently. She was better educated than her husband, helped him with his letters and bills, and frequently made contracts about the ranch matters. When question arose about selling guinea hens' or ducks' eggs, he said that his wife was boss—to see her about it.

We submit with confidence that if this establishes the domination of the wife and the subjugation of the husband, if it proves anything more than a recognition that the wife's wish is entitled to be heard and her requests considered in domestic and business affairs, then necessarily it must be said that ninety-nine husbands out of a hundred are led about by their wives in chains of servitude and are thus incompetent to make wills. But let us proceed and present other evidence from the same source—evidence where the husband not only acted upon his own initiative, but even against the views of his

wife.  For many of the latter years of his life he was road
overseer and had under his control sometimes over a hun-
dred men.  Dealing with these men, at least, he was inde-
pendent of his wife's domination.  He was a superb man
physically—over six feet tall and of a manner brusque and
commanding with his employees.  Upon the death of the in-
valid daughter the mother told contestant that they would
purchase a cemetery lot large enough to contain burial places
for six.  This was after the contestant's marriage.  But when
they reached the cemetery Mr. Stone refused to buy such a
lot and declared that he would buy a burial lot for three, as
there were only three in his family—meaning, of course,
thereby his wife and himself and his dead daughter.  He
proposed to consult and be treated by a Dr. Yoakum.  Mrs.
Stone objected, but he went.  He had numerous business
transactions with people and concluded his business without
reference to his wife.  He frequently bought her clothes.  He
refused to let her buy a buggy which she greatly desired.  He
sent her into the house to bring out a heavy dish of butter
which he wished to show a neighbor.  He would frequently
interrupt her when she had commenced a narration and say
"let me tell it," and he did so.  While there were differences
and disagreements at times between the spouses, generally
their relations were cordial and affectionate.

There is still another phase of the evidence meriting presen-
tation—the attitude and feeling of Mr. Stone himself toward
his daughter.  He did not want his daughter to ride with him
in the car returning from the invalid daughter's funeral.  He
did not want his daughter's flowers alongside of his on the
grave of the invalid daughter.  He frequently swore at her
before as well as after her marriage.  Upon one occasion when
Mrs. Green criticised her father for taking another lady out
in his carriage (though her mother did not object to it), he
became very angry, cursed her, and did not come to see her
for three years.  When he did come he abused her about the
slack condition of her front porch, declaring it was danger-
ous for one to try and cross it.  He was disappointed because
Mrs. Green did not marry to better advantage.  He disliked
the daughter's husband, saying to one witness that he (the
witness) was the only one whom he had ever heard speak
well of him.  He regretted bitterly to another that she had
married this "scrub"; that they had spent a fortune upon

the education of their daughter "and she married this man, and my wife will never get over it." He said that if she had married a rich man he would have given her five or ten acres of land.

One final piece of evidence must be noted. The contestant testifies that several weeks before her parents' departure for the east, passing a bank with her mother, her mother stated that in the vault was the father's will—he didn't want to make it, but she had him do so. As to the date, at least, it is demonstrated that the daughter's testimony is erroneous. The will, by all of the disinterested evidence, was not made until the day before the deceased's departure for the east. But, putting this aside, is it permissible to say that the wife's insistence that the husband shall make a will even remotely suggests that she unduly dominated him in the disposition of his property which he made by that will? Assuredly not.

What, then, is the picture held up to view by this evidence? It is that of a man and woman, who for the last forty years had been husband and wife, living their lives together upon a farm. Into their lives came a not unusual amount of bickering and dispute, and quite the usual amount of consideration and affection. Their hopes and ambitions were centered upon one daughter. If in her early years they treated her with harshness and severity, it appears that she was and must by her parents have been considered a somewhat unruly and headstrong child. She was carefully educated, and after reaching maturity bitterly disappointed them both by her conduct and her enforced marriage. When the husband and father died this daughter had a husband of her own to protect and support her. The aged wife is left the property which the husband is entitled to devise by will. She had been his helpmeet and companion for well-nigh forty years. She had reached the time of life when her own earning capacity was negligible. The property which her husband left her was no more than an assurance of her physical well-being and comfort during her remaining years. It cannot be necessary to quote from the authorities upon so plain a proposition. Suffice it to cite *In re McDevitt*, 95 Cal. 17, 33, [30 Pac. 101]; *In re Carriger's Estate*, 104 Cal. 81, 84, [37 Pac. 785]; *In re Wilson's Estate*, 117 Cal. 262, 270, [49 Pac. 172, 711]; *Estate of Tibbetts*, 137 Cal. 123, 128, [69 Pac. 978]; *Estate of Morey*, 147 Cal. 495, [82 Pac. 57]. If it be legal to over-

throw such a will as this under such evidence as this, then it would be better for the legislature to strike from the statute books the right to make any will at all, and leave the disposition of all property to its laws of succession.

The conclusion thus reached and declared necessitates a reversal of the judgment and order refusing to grant a new trial upon the indicated ground that the evidence is absolutely insufficient to sustain the verdict of the jury. This conclusion renders unnecessary the consideration of any of the other matters advanced for hearing by appellant.

The judgment and order appealed from are reversed.

Melvin, J., and Lorigan, J., concurred.