[Civ. No. 2607.   Third Appellate District.—June 6, 1923.]

In the Matter of the Estate of ELLEN E. RAMEY, Deceased. MAY McLAUGHLIN et al., Respondents, v. CHARLES E. WELSH, Appellant.

[1] WILLS—CONTEST—UNDUE INFLUENCE—INCOMPETENCY—EVIDENCE—PRESUMPTION—BURDEN OF PROOF—WEIGHT—APPEAL.—In a will contest upon the grounds of incompetency and undue influence, the burden of proof is upon the contestant, the presumption being that the testatrix was of sound and disposing mind and free from undue influence; but all questions as to the weight of the evidence and the credibility of the witnesses are for the jury and the trial court, and if there is any substantial evidence to support the finding or verdict it cannot be set aside by the reviewing court, although that court might believe the great preponderance of the evidence was the other way.

[2] ID. — UNSOUNDNESS OF MIND — SUFFICIENCY OF EVIDENCE. — To justify a finding or verdict against the will upon the ground of unsoundness of mind, the proof must go further than to show that the testator was feeble in mind, suffering from disease, and aged and infirm; it must be sufficient to warrant the inference that he was incapable of understanding the nature and situation of his property and of disposing thereof intelligently and was not free from delusion affecting his action.

[3] ID. — UNDUE INFLUENCE — PROOF. — The proof of undue influence must be such as to show that there was a pressure exercised and exerted which overpowered the mind and bore down the volition of the testator at the very time the will was made.

[4] ID.—CONFIDENTIAL RELATION—EVIDENCE.—In a will contest upon the ground of undue influence, even though it be admitted that a confidential relation existed betwen the parties, there must be some proof that such relation was used to take advantage of the testatrix, at the time the will was made, overcoming her free will and desire in order to invalidate the testament.

[5] ID.—SUFFICIENCY OF EVIDENCE—FINDING—APPEAL.—In this will contest upon the ground, among others, of undue influence, while some of the facts upon which the respondents relied to justify their position were of slight significance, the appellate court could not say that the entire showing was legally insufficient to warrant the jury's finding of undue influence.

2. What is testamentary capacity, note, L. R. A. 1915A, 443.
Epilepsy as affecting testamentary capacity, note, 16 A. L. R. 1418.

[6] ID.—BENEFICIARY AS WITNESS—WEIGHT OF TESTIMONY.—In a will contest upon the ground of undue influence, the jury, in weighing the testimony of the beneficiary under the will, have the right to consider his interest in the case and his manner on the stand, and, while not permitted to act capriciously or arbitrarily, if they believe he is not telling the truth when explaining certain questionable incidents surrounding the making of the will, they are authorized to reject his testimony.

[7] ID.—SEPARATE CONTESTS—PLEADING—ERROR—APPEAL.—Where two separate written contests filed are treated as the first pleading in the action and, although both are undoubtedly defective, the facts omitted from each are found either in the other or in the petition for the probate of the will, the judgment in favor of the contestants will not be disturbed on appeal because of an erroneous ruling of the trial court in passing upon proponent's demurrer to the contests.

[8] ID.—GROUNDS OF CONTEST—EVIDENCE—INSTRUCTIONS.—In a will contest in which many different grounds of contest are attempted to be set up, but evidence is presented in support of only two thereof, it is not prejudicial error to fail to specifically instruct the jury to disregard all allegations of contest other than those two, where such an instruction is not requested and the court does instruct the jury that "the issues which you are to determine in this action are the following," specifying the two in support of which evidence was presented.

[9] ID. — DEFINITION OF UNDUE INFLUENCE — INSTRUCTIONS. — In this will contest upon the ground, among others, of undue influence there was a sufficient showing of circumstances to justify the court in reading to the jury section 1575 of the Civil Code, as to what constitutes undue influence.

[10] ID. — ACTIONS OF BENEFICIARY — RELATION TO ATTORNEY — EVIDENCE—INSTRUCTIONS.—In a will contest upon the ground, among others, of undue influence, it is not prejudicial error to give an instruction that "it is proper for the jury to take into consideration all the actions" of the beneficiary under the will "as shown by the evidence at and immediately prior to the execution of the instrument"; neither is it prejudicial error to direct the jury that said beneficiary's relation to and connection with the attorney who drew the will might be considered as a circumstance in the case.

[11] ID.—DISTRIBUTION OF PROPERTY—INEQUALITY—INSTRUCTIONS.—In a will contest upon the grounds of incompetency and undue in-

---

11. Effect of unnatural testamentary disposition on question of incapacity or undue influence, notes, 7 Ann. Cas. 894; 13 Ann. Cas. 1044; Ann. Cas. 1917E, 130; 6 L. R. A. (N. S.) 202; 22 L. R. A. (N. S.) 1024.

fluence, an instruction that "inequality in the distribution of property among those who would inherit if no will had been made is not of itself evidence of undue influence or unsoundness of mind, yet it may be considered as a circumstance by the jury together with all the other facts and circumstances shown by the evidence as tending to establish undue influence or unsoundness of mind," while self-contradictory, is not prejudicially erroneous and is not violative of section 19 of article VI of the state constitution.

[12] ID.—FALSE REPRESENTATIONS—INSTRUCTIONS.—In a will contest, where there is no evidence of any false representations, it is not error to refuse a requested instruction on that subject, even though such instruction embodies a sound legal principle.

APPEAL from a judgment of the Superior Court of Sutter County. K. S. Mahon, Judge. Affirmed.

The facts are stated in the opinion of the court.

Crofton & Wetmore for Appellant.

A. H. Hewitt, Richard Belcher and W. H. Carlin for Respondents.

BURNETT, J.—The appeal is from a judgment denying probate of the purported will of Ellen E. Ramey, deceased, entered April 1, 1922. The judgment was based upon the verdict of a jury in favor of contestants, finding, first, that the testatrix on March 1, 1921, the date of the execution of the will, was of unsound mind, and, second, that she was then acting under the undue influence of proponent and appellant, Charles E. Welsh. The testatrix was a maiden lady of the age of seventy-three years at the time of her death in November, 1921. She left surviving her one brother and several children and grandchildren of deceased brothers and sisters as her sole heirs as law. She was the owner of personal property of the value of $14,000, consisting of bonds and money. For several years she had been subject to epileptic fits, but she was generally able to take care of herself, occupying for a long time prior to February 1, 1921, an apartment in the home of one Mrs. J. McFadden in Yuba City. At this latter date she became ill and needed and obtained the services of a physician, who advised her to go to a hospital. Acting upon his advice,

she went to the Rideout Hospital in Marysville, remaining there for two or three weeks and then going to the Sutter County Hospital as a pay patient, where she remained until March 7, 1921, when she went to the "King's Daughters' Home" in Oakland, where she died in November following. When she became ill at Mrs. McFadden's she sent for her nephew, Charles E. Welsh, the appellant herein, who resided on his farm near Sutter City, and he went to see her, and from that time until she arrived at the "King's Daughters' Home," he attended to all her business When she was at the Rideout Hospital she told appellant—according to his testimony—that she was getting too old to attend to business matters; that she wanted him to take care of her property interests and that she desired to get into some old people's home where she could spend the rest of her days and not be bothered any more about business matters. Thereupon she executed and delivered to him a power of attorney, on February 23d, and at the same time gave to him a check for $4,029, the amount of her deposit in the First National Bank of Yuba City, which he cashed and deposited the amount in the same bank in his own name, and proceeded to draw checks against it for his and her expenses. In her will she made appellant the sole beneficiary and designated him her executor. To his application for admission of the will to probate and his appointment as executor a contest was filed, purporting to be that of May McLaughlin and Owen D. Welsh, a niece and nephew respectively of the decedent, alleging incompetency of the testatrix at the time of the execution of the will, but the contest as to Owen D. Welsh was unauthorized by him and at his request at the beginning of the trial it was dismissed. Minnie C. Clements, Clarence Clements, and Marion Clements, as "grandniece and grandnephews respectively, of said Ellen E. Ramey, deceased, being children of a deceased niece," jointly filed another contest, alleging, first the incompetency of the deceased and unfitness of Charles E. Welsh to act as executor; second, the nonexecution of the will, and, third, undue influence on the part of Charles E. Welsh. Demurrers to the contests were interposed but overruled and answers were thereupon filed. At the close of contestants' case a motion for nonsuit was made by proponent and denied by the court. The findings of the jury

were upon two special interrogatories submitted at the request of the contestants.

According to the usual course of such trials proponent first offered proof of the due execution of the will. Waldo S. Johnson, a prominent attorney of Marysville, testified that on the morning of March 1st he was requested by M. T. Brittan, an attorney of Marysville, to act as a witness to the will in question; that he did not know Ellen E. Ramey, but was informed that she was an elderly lady and in the hospital; that he went there in a machine with Mr. Brittan and Charles E. Welsh and he and Mr. Brittan were shown into her room; after some informal talk he stated that having understood she was a lady of advanced years he would like to satisfy himself as to her mental condition at the time. He was then left alone with her and the door was closed. He had the will with him, which he had received from Mr. Brittan. He took it up and discussed it in detail and asked her if she understood exactly what she was doing, how she was disposing of her property and she said she did, that is the way she wanted it to go. He talked with her upon several subjects and formed his opinion as to her mental condition. He then called Mr. Brittan and told him to proceed. The will was thereupon executed according to the requirement of the statute and she retained it in her possession. The door was then thrown open and one of the nurses came in, and a little later, the proponent, and they all sat there for ten or fifteen minutes more talking informally, and finally the testatrix handed the will to her nephew and told him to take care of it, that it was her last will and testament. She was of sound and disposing mind at the time; that she was up and dressed when she signed the will and had no fit while he was there; that he never heard of her having fits and that Mr. Welsh was not in the room when the will was executed.

Charles E. Welsh testified that he had known Ellen E. Ramey ever since he was old enough to remember, that he had seen her a great many times since 1919 and talked with her on those occasions. He used to go with her to transact her own business. She was of sound and disposing mind on March 1st, when she executed the will. His reasons for so believing were based upon the manner in which she talked, the way she transacted her business, the care she took of

62 Cal. App.—27

her property, her knowledge of what property she had and her demeanor and conversation generally. After testatrix became ill in the latter part of January, 1921, and while she was at the hospital, she told the witness that she wanted to go below and stay in the home and that she wanted him to handle her property; that she did not tell him she was going to make a will in his favor and that he never talked to her in any way about making a will; that she told him to bring or send out an attorney and he took Mr. Brittan to see her. After he talked with her Mr. Brittan drew up the power of attorney, making the witness her attorney in fact; that she never told him she wanted an attorney to draw a will; that he had taken Mr. Brittan out on February 27th or 28th, and he did not hear any of the conversation between them. He did not know what Mr. Brittan went there for until March 1st; that after the execution of the will he was in the room with his aunt and Mr. Johnson and Mr. Brittan probably fifteen minutes. The testatrix handed him the document and said, "Take care of that." In reply to a question on cross-examination to state all that his aunt said, he replied: "I don't know as she said very much, she wanted to know how everybody was, handed me this paper, told me to take care of it, wanted to know if I had heard anything from the Home down there, when she could go, she was getting anxious to go, she was tired of that place. I told her I would find out as quickly as I could and let her know as quickly as I could find out."

M. T. Brittan, the other subscribing witness, testified substantially as the two foregoing in reference to the execution of the will; that Ellen E. Ramey appeared to him to be of sound and disposing mind at the time; that he had seen her concerning this document before he prepared it; that Mr. Welsh came to his office and told him that she wanted to see an attorney, but said nothing about her purpose.

Contestants thereupon called to the stand Mrs. Elsie Horton Wilcoxson, one of their most important witnesses, who was the head nurse or matron at the Sutter County Hospital She testified that Ellen E. Ramey was an inmate of the hospital from February 19 to March 7, 1921; that during all that time her physical condition was very bad; that she had at least five or six epileptic fits while she was there. She knew her before she went to the hospital and observed her

mental condition while she was a patient there. She was
not in her opinion of sound and disposing mind. Her rea-
sons for the opinion were that, after one of these convulsions,
Miss Ramey would lie for several days without talking to
anyone, apparently in a semi-conscious condition; sometimes
she would know anyone and sometimes not; she was in bed
most of the time; her mental condition was about the same
all the time she was there; she saw her frequently and Miss
Ramey was under her charge; she talked with her every
day; she observed her condition and general appearance
and actions; from this she concluded that she was not of
sound mind and that condition existed on March 1st; tes-
tatrix talked with her only once about her business affairs;
that was in the evening after the execution of the will; at
that time testatrix stated to her that Mr. Welsh (Charles
E. Welsh, proponent), intended to take care of her for the
rest of her life and was preparing to take her to Oakland
to a home; she stated she was sorry she had signed her name
to any papers, but didn't state what the papers were; she
appeared to be nervous and looked very despondent; the
attacks of epilepsy would last for several hours before she
would become conscious, then she would lie in a semi-con-
scious condition for several days after that, sometimes two
or three days; witness could not remember how long prior
to March 1st testatrix had one of these attacks. They did
not recur at regular intervals, but she thought the patient
had one between March 1st and 7th. Between those dates
inclusive the physical condition of testatrix was very weak;
from February 19th to March 1st decedent was not able
to take care of herself physically at any time; she would
with help get up and sit in a chair a while; she would get
up and fall down; by helping her, aiding her she could
walk some, but she could not get up and walk around with-
out someone helping her. She became weaker as the days
went on, and as her physical condition sank so did her mind;
she knew Mr. Johnson and Mr. Brittan were in the room
with Miss Ramey on March 1st; that she saw them enter
and as far as she could remember Charles E. Welsh went
in with them; she did not hear them talking in there as she
did not stop to listen to their talking; they were there pos-
sibly half an hour and she saw them come out and go away
together. She had seen Miss Ramey prior to the entrance

of these gentlemen into the room, possibly an hour or so; she was then sitting in a rocking-chair; she had been helped to be dressed and helped to a chair; she saw her a few minutes after the gentlemen left when she was helped to a bed, being then weak and apparently exhausted.

Mrs. Wilcoxson was followed by Dr. Allen E. Gray, the regular county physician, as well as the special physician for testatrix while she was in the county hospital. He testified that the physical condition of testatrix while she was there was not very good, she was weak and had a number of epileptic attacks; that she was able at times to walk about the grounds unassisted. As to her competency the record of his testimony is as follows:

"Q. What was her mental condition as to soundness of mind? A. Well, I didn't see there was any mental symptoms, that is any insanity or anything like that. Q. What was your answer? A. I didn't consider her insane. Q. You didn't consider her insane? A. No. Q. Did you consider her incompetent to transact business? A. At what time? Q. The time she was at the hospital. A. I did when she first entered the hospital, but afterward I considered she was incompetent. Q. Was her condition getting worse or better while she was there—from the time she entered the hospital? A. I had her at the Rideout Hospital first. Q. I am speaking of along about March 1st. A. There wasn't so much difference from the time that she entered until she left. Q. What was the condition of her mind during the last of February and March, 1921? The Court: As to being competent or incompetent. A. Well, the same question was brought out when the guardian was appointed, it was an act she did that made me think she was incompetent and that was around the latter part of February, that was the only act she did that made me believe she was incompetent."

The witness afterward explained that the act to which he referred was the transfer of all her property to Mr. Welsh without any security. It may be added that the appointment of a guardian to which he alluded took place in September— more than six months after the execution of the will. He testified that the patient had several epileptic fits while at the hospital but he could not say just when. He would not state that she had one on March 1st or February 27th or

28th, as he did not remember the date. He admitted that just before the power of attorney was executed to Mr. Welsh he advised him and his brother, Foster Welsh, that Miss Ramey was in his opinion perfectly competent to do business. These two were the only witnesses for the contestants who testified as to the physical or mental condition of testatrix while she was at the county hospital.

Henry Chism, an acquaintance of testatrix, expressed the opinion that she was of unsound mind. He had known her for some years, but his acquaintance with her was quite limited and he saw her infrequently. He could not say when was the last time he talked with her, but thought it was within the last five years. He admitted that he did not like her; that he never visited at her house socially, in a business way, or otherwise within four or five years prior to her death.

Mrs. Chism, the wife of Henry Chism, testified also that in her opinion Miss Ramey was of unsound mind within "the last two years of her life or one year for that matter." She saw testatrix frequently during the last two years of her life, as the witness resided just across the street from the McFadden home. Her reason for believing her incompetent was that she thought Miss Ramey did not speak intelligently at times; that "I found her mind was weakened all the time and in talking to her I could see that her mind was very poor."

C. A. Duncan testified that he knew testatrix a little more than fifty years. She lived, most of the time, at Miss McFadden's near his place. He saw her occasionally. He did not particularly have conversation with her, but he used to carry groceries from his store to her when she would ask him to do so. During the last years of her life there was a change in her "physical or mental condition." He was asked the question, "Would you consider her as being of sound and disposing mind during the last part of her life, prior to March 1, 1921?" His reply was: "Well, at times Miss Ramey seemed to be of sound mind, at other times she did not. She was subject to spells and after those spells she didn't seem to be just at herself." Within the last two years of testatrix's life while he lived next door to her he would see her quite often in the yard and he talked to her occasionally. He could not say that it was oftener than

once a month that he talked to her; he never visited her home during that period, but she came to his house occasionally and visited with his wife. In ordering groceries she did not appear to be of unsound mind and in her conversation generally she would talk just like any other acquaintance, but sometimes she would talk in a rambling fashion, although not when she was ordering groceries.

Dr. A. J. Duncan, a practicing physician, testified that he knew Miss Ramey perhaps twenty years; that he would see her frequently; that at the request of Mr. Welsh he visited her while she was at the hospital, some time between February 22d and March 1st, she was in bed and he stayed only a few minutes. When he went into the room she recognized him, called him by name and he asked her how old she was and she told him. He knew at the time that she was subject to epileptic fits. After he found out who it was he declined to make any further examination, but from the examination he made and his knowledge of her case generally he did not consider her competent and his reason for the opinion was: "I believe that a person that is subject to chronic epilepsy at her age deteriorates mentally." He admitted that at the time of his visit to her he did not consider himself competent as a physician and surgeon to pass upon the mental capacity of Miss Ramey and that apparently at that time she was perfectly rational.

The foregoing we consider a fair synopsis of the evidence before the court when the motion for nonsuit was made and denied.

Thereupon proponent called Mrs. J. McFadden, in whose house Miss Ramey had occupied apartments at different periods from March, 1910, to the latter part of January or first of February, 1921, when she went to the Rideout Hospital, two weeks before the execution of the will. The witness saw testatrix frequently during this period and had opportunity of observing her manner and actions and had conversations with her. She observed her as she would anyone else under the same circumstances and was no more interested in her than in anyone else. The witness declared that during the entire period Miss Ramey seemed to be of sound and disposing mind; that she did not see anything to the contrary; that Miss Ramey managed her own affairs, attended to her own business and when she wanted to pay

her rent she went down to the bank and got her money to pay it with. The witness saw testatrix three times after she went to the Rideout Hospital, where witness visited her. She went there because she thought Miss Ramey might be lonesome and she had conversations with her on these visits; she did not remember what the conversation was, but conversed with her as she would with anyone else; that the only circumstance she remembered was that the hospital bills had been presented to Miss Ramey and the latter said she had no way of paying bills until Mr. Welsh came in and she would have him bring checks for her and testatrix was worried that bills were presented to her when she expected him to attend to that matter. The witness remembered that previous to that, it might have been six months previous, when testatrix was somewhat indisposed, witness had at the request of testatrix written to Mr. Charles E. Welsh to come in when it was convenient to see Miss Ramey. As to the epilepsy, witness testified that testatrix would lapse into unconsciousness without any premonition at all that it was going to occur; testatrix told her that she did not know for a half minute beforehand that the spells were coming on; witness never saw her when she passed into unconsciousness, but was informed immediately or heard her and took occasion to have her placed upon the bed. Sometimes she would be six months free from them, then again she might have two very close together; testatrix never required a physician, but Doctor Gray had told her that she had better go to the Rideout Hospital, as she had no attendant in her room and she would improve faster in the hospital. While testatrix was ill at her home witness visited her several times a day and she had no spasms or convulsions, and her physical condition when she visited her at the Rideout Hospital was about the same as when she left the home of witness.

As stated by appellant, Mrs. McFadden was apparently the closest and most intimate acquaintance of Miss Ramey during the period in which she knew her, and her testimony was clear and emphatic that testatrix was of sound and disposing mind at that time.

C. A. Emory, whose wife is a grandniece of Miss Ramey, knew the testatrix for about seven years; he was a grocery clerk in Yuba City most of the time from the fall of 1917

to the spring of 1920; before going to work in the store he would see her probably once in every two weeks, meet her on the street or at home and had general conversations with her now and then; she did some of her trading at the store and he generally waited on her. He had opportunities to observe her conduct and manner generally and he would say that she was very much of sound mind; she knew exactly what she was coming to the store for, the price of everything she wanted, whether it was cheaper at one place than another and could hold an ordinary conversation as well as anyone as far as witness could state. The last time he saw her was in January, 1921, in front of the postoffice and he had a conversation with her at that time, that she asked him how everything was, about the family, wife and children. She named the wife and children. He observed nothing in her manner, speech, or conversation at that time indicating any difference in her mental condition from what it had been during the entire period that he knew her..

Dr. Fred B. Tapley testified that he had been a practicing physician since 1916 and had made a study of epilepsy and its effect upon the mind and body of the patient; he knew testatrix in her lifetime, for fifteen or twenty years; he called to see her once about ten years ago when she had an epileptic fit; the next time he saw her was in the Sutter · County Hospital about a year before the trial, between February 19 and March 7, 1921. He was called there to pass on her mental condition and as to that he stated: "Well, after talking with her quite a while we decided there wasn't much wrong with her at that time outside of her age and feeble condition due to her age, found she was mentally competent." When he made the examination he knew her history in a general way in reference to epilepsy; that epilepsy, even when chronic and extending over a considerable period of years, does not necessarily result in insanity, and does not frequently so result; that these fits did not render testatrix insane or of unsound mind.

He was followed by a large number of witnesses, including nephews and nieces of testatrix, a physician of experience in the treatment of epilepsy who was also acquainted with Miss Ramey, and other acquaintances, who testified that, in their opinion, she was of sound and disposing mind.

There was also evidence of some minor and incidental matters, but we deem it unnecessary to reproduce it.

We have thus called attention to the testimony at considerable length for the reason that appellant earnestly insists that it is utterly insufficient to sustain either finding of the jury, and also to indicate the significance of certain rulings of the court.

In considering the question of the support for the findings, certain legal principles must, of course, be regarded. We may mention only the following: [1] The burden of proof is upon contestant, the presumption being, manifestly, that the testatrix was of sound and disposing mind and free from undue influence. (*Estate of Latour*, 140 Cal. 414 [73 Pac. 1070, 74 Pac. 441]; *Estate of Stone*, 172 Cal. 215 [155 Pac. 992].) However, in will contests the rule is the same as in other proceedings, that all questions of the weight of the evidence and the credibility of the witnesses are for the jury and the trial court, and if there be any substantial evidence to support the finding or verdict it cannot be set aside by the reviewing court, although said court might believe the great preponderance of the evidence was the other way. (*Estate of Snowball*, 157 Cal. 301 [107 Pac. 598].)

[2] But as to the proof justifying a finding or verdict against the will upon the ground of unsoundness of mind, it must go further than to show that the testator was feeble in mind, suffering from disease and aged and infirm, it must be sufficient to warrant the inference that he was incapable of understanding the nature and situation of his property and of disposing thereof intelligently and was not free from delusions affecting his action. (*Estate of Motz*, 136 Cal. 558 [69 Pac. 294].)

[3] Also the proof of undue influence must be such as to show that there was a pressure exercised and exerted "which overpowered the mind and bore down the volition of the testator at the very time the will was made." (*Estate of Gleason*, 164 Cal. 756 [130 Pac. 872].)

As to the claim of undue influence it is the contention of appellant that the record is destitute of any such showing. He points out that this issue was tendered, if at all, only in the contest of the Clements; that therein the sole specification of fact is that Welsh "by representing to said

decedent that he would properly care for her in her sickness and that her other relations did not care what became of her and had no regard for her, he induced and persuaded her to make the said will.'' Appellant insists that there is no such evidence whatever. Assuredly, there is no direct evidence of any such representation. The nearest approach to a suggestion of that character is found in the testimony of Miss Wilcoxson that Miss Ramey stated to her that "Mr. Welsh intended to take care of her for the rest of her life and was preparing to take her to Oakland to a Home." Nothing was said, however, as to such promise having been made to induce her to make a will in his favor, and it would hardly be just to construe this apparently innocent and praiseworthy intention as evidence of a previous wicked and sinister design to take advantage of Miss Ramey in the disposition of her property.

Without attempting to reproduce the argument of appellant upon this branch of the case, we deem it sufficient to state that he insists that we find none of the usual "earmarks" of undue influence; there was no evidence that she had any particular regard or affection for any of her relatives other than proponent, unless it be her niece, Laura Stevenson, who testified for proponent, or that she was even acquainted with the Clements, the contestants who alleged undue influence; that, on the contrary, she relied upon proponent for several years for assistance when she needed it; and as persuasive evidence of her regard for and confidence in him she sent for Welsh when she became ill a few weeks before the will was executed as she had done on previous occasions; there was no evidence of any attempt at solicitation, coercion, or any misrepresentation of any kind; and if it be admitted that a confidential relation existed between the parties, this does not even raise a suspicion of undue influence. [4] There must be some proof that such relation was used to take advantage of the testatrix, at the time the will was made, overcoming her free will and desire in order to invalidate the testament. (*Estate of Nelson,* 132 Cal. 182 [64 Pac. 294]; *Estate of Ricks,* 160 Cal. 450 [117 Pac. 532].)

While admitting that undue influence may be shown by circumstantial evidence—indeed, it can hardly ever be shown in any other way—appellant insists that the circumstances can do no more than excite suspicion that the proponent un-

fairly and unduly influenced the testatrix, and it is rightly said that suspicion is not sufficient. In fact, appellant asserts that every circumstance in the case accords with the hypothesis that the will was the free act of the mind of testatrix, and if some of the circumstances may be consistent with the theory of undue influence the view in favor of the validity of the will must prevail. (*In re McDevitt,* 95 Cal. 17 [30 Pac. 101].)

In reply to this challenge respondents group certain circumstances, which they claim are sufficient in their cumulative probative force to justify both findings. Of these we select only those that may have a bearing upon undue influence: 1. While Miss Ramey was at the county hospital she had five or six of these epileptic spasms or convulsions; she was sinking rapidly, both physically and mentally; was suffering from a fatal malady and at no time was entirely free from the effect of these epileptic attacks; 2. She had been through life a very economical and thrifty person and had saved an estate of the value of about $14,000; 3. After going to the Rideout Hospital, although she was ill, her life habit lingered, and, finding that she was paying $40 per week, she had herself taken to the Sutter County Hospital, where she could obtain accommodations for $30 a week; 4. From the time she entered that institution on February 19 until and including March 1, 1921, proponent called upon and conversed with her nearly every day, and brought to see her at least four or five times the attorney, M. T. Brittan, who finally drew the supposed will; 5. On February 23d she drew a check in favor of respondent for the entire amount of her deposit in the bank, and on the same day, in the presence of Brittan and proponent, she executed the general power of attorney, which was afterward acknowledged by Brittan before Waldo S. Johnson; 6. Proponent deposited the check to his own credit in the bank and immediately began drawing out the money until the bank refused to honor any of his checks; 7. Having obtained control of all her property he hunted up a home in Oakland for her, and, as respondents say, ascertaining "that he could place her there at $60 per month if she occupied a public ward and $70 in a private room and thriftily, of course, selected for her the public ward, thus saving $10 per month"; 8. Having been unable to obtain all her property through the power of attorney

and the check which she gave him he goes out with Mr.
Brittan and Mr. Johnson and these three men were closeted
with her for half an hour or an hour before the will was
executed; thereafter Miss Ramey was exhausted and ex-
pressed regret that she had signed some papers; 9. From
various circumstances respondents claim it to be a fair in-
ference that the supposed will was prepared in the office of
attorney Brittan in the city of Marysville at the request of
proponent Charles E. Welsh and that Attorney Johnson was
called in and the three went out to Miss Ramey with the
paper already drawn; 10. Something like a year prior to
March 1, 1921, Miss Ramey had declared her intention to
execute a will in favor of respondent May McLaughlin.

Manifestly, as stated by this court recently in the *Estate
of Gallo,* 61 Cal. App. 163 [214 Pac. 496], "in building
up a case on circumstantial evidence it is not necessary that
any single fact proved, standing alone, shall establish the
issue, but it is sufficient if all the facts and circumstances
given in evidence, considered together, lead to a rational in-
ference that the ultimate fact is, as alleged." [5] Some of
the facts upon which respondents rely to justify their posi-
tion are indeed of slight significance, but we think it should
not be held by an appellate court that the entire showing is
legally insufficient to warrant the finding of undue influence.
Of course, as has often been stated, each case must stand or
fall upon its own peculiar facts, and precedents are valuable
largely for their exposition of the ruling principles in such
consideration.   Appellant thinks we should follow the teach-
ing of the Missouri supreme court in the case of *Doherty* v.
*Gilmore,* 136 Mo. 414 [37 S. W. 1127], wherein it was held
that "in an action to set aside a will, evidence that defend-
ant was a member of testator's family at the time the will
was drawn, and for years prior thereto; that at testator's
request he went after the attorney who drew the instrument;
that he and his brother and sister were the principal bene-
ficiaries; that testator was old and infirm, and in making the
will ignored to a great extent a niece who had been his
constant attendant for years; and that prior to the execution
of the will, defendant had drawn out, on testators' checks,
all the money the latter then had in bank does not show facts
from which undue influence can be reasonably inferred and
submission of the issue to the jury therein is erroneous."

No doubt that court is entitled to great respect, but it is to be observed that the decision was not unanimous, that the adverse showing was not so formidable as herein, and it is quite probable that other courts of equal learning would decide that a sufficient case was made out to submit to the jury.

On the other hand, respondents cite *Estate of Snowball, supra,* and *Estate of De Laveaga,* 165 Cal. 607 [133 Pac. 307], to which they would now probably add *Estate of Gallo, supra,* as authoritative precedents for their contention. It must be admitted, however, that they involved certain facts for which there is no equivalent in the case at bar, but we think without an undue extension of the doctrine of these cases we may find therein sanction for the conclusion we have reached.

[6] But it is claimed that the foregoing questionable incidents were all explained by proponent and that his explanation should have removed any implication of unfairness. It was for the jury and the trial court, though, to say whether his explanation was satisfactory and to believe a part of his testimony while disbelieving another portion, if their conscientious judgment so directed. They had the right to consider his interest in the case and his manner on the stand, and while not permitted to act capriciously or arbitrarily, yet if they believed that proponent was not telling the truth when stating that his aunt had sent for him and that the suggestions in reference to the disposition of the property came from her, they were authorized to reject it.

Nor is it sufficient reason for us to set aside the finding because we may consider the evidence consistent with good faith on the part of proponent. If there is an intimation to that effect in any of the decisions, it is undoubtedly ill-advised. The rule is, as before stated, that if a rational inference may be drawn from the evidence in favor of the finding of the jury the appellate court is bound by it, although it may believe that a contrary conclusion would have been more reasonable and satisfactory.

The other question seems less difficult of solution. It is apparent that the expression of opinion as to the competency of the testatrix by some of the witnesses for contestants is of no value by reason of their slight acquaintance with her and their infrequent opportunities to observe and converse with

her. The reasons assigned for such opinion are also inadequate, and as stated by this court in the *Estate of Campbell,* 46 Cal. App. 612 [189 Pac. 812] : ''The opinion of a witness that a person is of unsound mind can not be stronger than, or of superior evidentiary weight to the reasons upon which he bases his opinion.''

It is equally manifest that the testimony of the physicians in favor of contestants is of slight importance. It is apparent that they were very much in doubt in reference to her mental condition and their admissions were such as to deprive of any substantial probative force their expression of opinion that she was of unsound mind.

As to this issue respondents' case can be upheld only, if at all, upon the testimony of Mrs. Wilcoxson. But, as said by appellant, there is ''not a word in her testimony of any insanity, delirium, loss of memory or failure to know or understand, upon the part of the testatrix, on March 1, 1921, the day the will was executed, nor at any other time, except when she *may* have been, as the witness claimed, in an unconscious or semi-conscious condition after one of these fits, and she certainly did not have one of these so-called fits on that day and could not have had one later than at least two days prior thereto according to the witness' own testimony.'' Appellant claims that the vital parts of her testimony are peculiarly ''self-contradictory and inherently impossible,'' but granting that the jury was justified in fully crediting her statements it nevertheless is true that her opinion of mental unsoundness was based upon the reason that in consequence of the epileptic fits Miss Ramey was unconscious or semi-conscious, and that on the day in question she was not in such condition at all. Indeed, she talked with Miss Ramey on business matters on that day and she makes no claim that what was said or done or the appearance of testatrix indicated any mental infirmity. For further consideration of the legal aspect of the question involved we may refer to the *Estate of Campbell, supra; Estate of Guilbert,* 46 Cal. App. 55 [188 Pac. 807] ; *Estate of Nelson, supra; Estate of Motz, supra; Estate of Morey,* 147 Cal. 495 [82 Pac. 57] ; *Estate of Purcell,* 164 Cal. 300 [128 Pac. 932] ; *Estate of Packer,* 164 Cal. 525 [129 Pac. 778] ; *Estate of Fraser,* 177 Cal. 266 [170 Pac. 601] ; *Estate of Casarotti,* 184 Cal. 73 [192 Pac. 1085].

To fortify their position as to mental incompetency respondents cite *Estate of Olson,* 19 Cal. App. 379 [126 Pac. 171]; *Estate of Snowball, supra; Estate of De Laveaga,* 165 Cal. 607 [133 Pac. 307]. The first of these treated only of the sufficiency of the pleadings and of the findings to support the judgment, the evidence not having been brought up. The *Estate of Snowball* involved only the issue of undue influence and the supreme court held that the evidence was sufficient to support the finding upon that question.

In the *Estate of De Laveaga* it was held, after an exhaustive review of the evidence, that it was sufficient to support the conclusion of the trial judge on both issues. But, as stated by the supreme court in reference to the mental competency of the testatrix: "We find portrayed a woman utterly incompetent at any time to understandingly and intelligently consider her property with a view to its proper disposition by will, and moreover utterly incompetent alone and unaided to compose and write the admirably constructed document in so far as phraseology is concerned, which was offered for probate as her last will. Contestants' evidence tended to show, among other things, that as a girl and young woman she was unable to materially progress in so far as the simplest kind of education was concerned; that her mind remained to the time of her death as that of a child, unable to comprehend anything beyond the most simple matters."

Other considerations are set forth in the opinion which added weight to the inference that the testatrix was entirely without understanding of what she was doing at the time the supposed will was executed. The foregoing statement is sufficient to show the marked distinction between that case and this.

Objections are made to the action of the trial court in overruling the demurrers to the contests, to the rulings of the court upon the admissibility of evidence and of giving and refusing certain instructions.

[7] As to the two separate written contests it is plain that they are regarded as the first pleading in the action and are subject to the same grounds of demurrer as any other complaint. (Sec. 1312, Code Civ. Proc.) Each of them is undoubtedly defective, but, as we view it, the proponent was not prejudiced by the ruling. He claims that the contest of May McLaughlin was fatally defective in its

failure to allege certain facts, which he enumerates. But they were alleged in the petition for the probate of the will, and while, as a matter of good pleading, they should have been set out in the written contest, it is apparent after trial that appellant was not damaged by the omission. Besides, they were alleged in the contest of the Clements, and if the latter was sufficient, the final judgment should not be disturbed simply because of an erroneous ruling as to the other contest.

The only serious objection to the complaint of the Clements is that the allegation of undue influence is that of a legal conclusion, but when the whole of it is considered we are satisfied that sufficient facts appear to measure up to the requirement of the rule as stated in the *Estate of Olson, supra.* Here, again, we may say the case was fully tried upon the theory of the sufficiency of the pleadings and appellant was not misled nor injured by any of the supposed shortcomings.

[8] Complaint is made of the instruction by the court that the contest was upon two grounds, namely, unsoundness of mind and the undue influence of Charles E. Welsh. The contention is that two other grounds were attempted to be set up, to wit, the nonexecution of the will and that Charles E. Welsh was not a fit and proper person to be appointed as executor of the will, and as none of these had been withdrawn or dismissed, the court should have directed the jury "to wholly disregard all allegations of contest other than the one of soundness of mind and the question of undue influence." We see no merit in this criticism. The court in effect told the jury to disregard the other grounds when it confined the attention of the jury to the two which were mentioned. We may add that the matter was placed beyond controversy by the second instruction in which the court expressly stated that "the issues which you are to determine in this action are the following" (specifying the two already referred to). If appellant desired a more specific statement as to the other two supposed grounds he should have requested it.

[9] It was proper to read section 1575 of the Civil Code as to what constitutes "undue influence." It cannot be supposed that the jury did not need such instruction and, as to the claim that it was not applicable to the facts, since there

was no evidence that appellant took "an unfair advantage of the mental weakness of testatrix," we think there was a sufficient showing of circumstances to justify the instruction. The word "her" was substituted for "him" in the section, but manifestly this was harmless, as any application of the instruction would necessarily be to proponent's dealings with *her*, the testatrix. The masculine pronoun would have answered the purpose, of course, just as well, but the change was innocuous.

A similar objection is made to instruction No. 4 upon the ground that "there was absolutely no evidence of 'any improper pressure or other unfair conduct exercised by Charles E. Welsh or anyone else which would overcome the volition of the testatrix.' " There was, manifestly, no such direct evidence, but, as already stated, the theory embodied in the instruction finds substantial support in the circumstances of the case. Appellant is entirely mistaken in the claim that the instruction "assumes, in its initial statement that it is a fact that in this particular case 'improper pressure' and 'unfair conduct' had been used; in other words, that undue influence had been established." The language of the instruction is clearly hypothetical: "A will is obtained by undue influence *where* improper pressure or other unfair conduct has overcome," etc. It left to the jury to determine whether it was a case where such conduct existed. This is made even plainer by the concluding portion of the instruction.

[10] Appellant complains most bitterly of instruction No. 6. He says that "the mere fact that he visited testatrix frequently at the said hospital, and which was shown conclusively by the evidence was for the purpose of arranging her affairs at her own request, could not be considered as sufficient evidence at all of any undue influence." Appellant is clearly right in that claim, but the court did not so instruct the jury. The instruction was that "it is proper for the jury to take into consideration all the actions of said Charles E. Welsh as shown by the evidence at and immediately prior to the execution of the instrument." No specific mention was made of his visits to the hospital.

Nor did the instruction leave the jury at liberty to find undue influence because Charles E. Welsh "sent Mr. Brittan to testatrix, though at the request of testatrix, if they thought

62 Cal. App.—28

Mr. Brittan had exercised any influence over testatrix." It simply directed the jury that Welsh's relation to and connection with the attorney who drew the will might be considered as a circumstance in the case. There was no necessity for giving such instruction but we can see no prejudicial error therein.

[11] Appellant, claiming that it violated section 19 of article VI of the state constitution, prohibiting judges from charging jurors with respect to matters of fact, criticises the action of the court in giving this instruction: "The court instructs you that inequality in the distribution of property among those who would inherit if no will had been made, is not of itself evidence of undue influence or unsoundness of mind, yet it may be considered as a circumstance by the jury together with all the other facts and circumstances shown by the evidence as tending to establish undue influence or unsoundness of mind."

We do not consider the instruction as violative of said provisions of the constitution. The court by said instruction did not *direct* the jury to consider said circumstance for such purpose nor was there any intimation as to the weight that should be accorded it, but their attention was specifically directed to it as a part of the evidence which they might regard in the case as tending to establish the claim of respondents, leaving it to the jury, however, to say what importance they should attach to it. The instruction is self-contradictory as the first part of it implies that such circumstance should not be considered as evidence at all, and, besides, that particular circumstance should not have been singled out for special attention, but we think that appellant was not prejudiced thereby.

[12] Appellant complains of the refusal of the court to give this proposed instruction: "When fraud or fraudulent representations made to the testator are relied on as an element in undue influence, it must appear not only that the representations were false and believed to be true by the testator, but that they were made the basis of importunity and mental pressure upon the testator and that the testamentary act was the result thereof, before the jury can find that there was any fraud practiced upon the testator in the making of the will."

While the foregoing embodies a sound legal principle, it was not applicable to the case as there was no evidence of any false representations. In the absence of any evidence to that effect it surely could not be said that such representations were relied on. It is not error to refuse an instruction, which, however correct in principle, is not pertinent to any theory of the evidence.

Certain instructions as to mental soundness, given by the court, are assailed by appellant but they need not be considered in view of our conclusion that the evidence is insufficient to support the finding upon that issue.

As to the rulings upon the admissibility of evidence we have examined all the assignments of error and while we think the ruling should have been the other way in some instances, yet we find nothing therein of sufficient gravity to demand a reversal.

As either finding would support the judgment (*Estate of Baker*, 176 Cal. 430 [168 Pac. 881]), and we are of the opinion that there was a sufficient showing of undue influence, the judgment is affirmed.

Plummer, J., *pro tem.*, and Finch, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 2, 1923.